CHARLES E. MITCHELL, PETITIONER *v*. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.

Docket No. 74720.   Promulgated August 6, 1935.

*William Wallace*, *Esq.*, *Leonard Moore*, *Esq.*, and *Robert Reed*, *Esq.*, for the petitioner.

*Edward S. Greenbaum*, *Esq.*, *Thomas E. Dewey*, *Esq.*, *J. D. Head*, *Esq.*, and *Nathan Gammon*, *Esq.*, for the respondent.

1104

1108

1120

1122

1126

**1128**

VAN FOSSAN: In this case the Government charges that for each of the tax years 1929 and 1930 petitioner filed a false and fraudulent return with intent to evade tax. The years stand separately. The establishment of fraud in the particular year is a prerequisite to further consideration of the case for that year. If there was no fraud, the statute of limitations has run against any deficiency for such year. If fraud be proven the case is before us on all issues for the year in question. Sec. 276 (a), Revenue Act of 1928.

Under the revenue laws every taxpayer is, in the first instance, his own assessor. He determines the amount of tax due. This privilege carries with it a concurrent responsibility to deal frankly and honestly with the Government—to make a full revelation and fair return of all income received and to claim no deductions not legally due. This responsibility is not properly discharged by resolving all doubts against the Government, or by giving effect to studied efforts to wipe out taxable income by secret and questionable practices. It is a maxim of our law that, in dealing with the Government, taxpayers must turn square corners.

The responsibility of making a tax return is personal and rests squarely on the shoulders of the taxpayer. When he makes oath to the correctness of his return he assumes responsibility therefor. Only in rare instances can the consequences incident thereto be delegated to another.

Section 293 (b) of the Revenue Act of 1928 provides:

SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY.

   *       *       *       *       *       *       *

(b) *Fraud.*—If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.

To determine whether or not fraud exists, a case must be studied, not alone for conformity to definition, nor with a blind adherence to syllogistic reasoning. Fraud is a fact to be proven by clear and convincing evidence. Seldom does all the evidence point one way. There are usually facts that tend to support petitioner's theory of the case—that tend to clear him of any fraudulent intent; and there are other facts that point in the opposite direction and tend to prove fraud. Likewise, the proof of fraud by the citation of one single specific act is seldom possible. It is usually to be determined by viewing a whole course of conduct involving many acts and inferences. In this process of analysis the old illustration of the strength of a bundle of sticks is apt. Separate facts may be reasoned away

and their force broken by plausible explanations, but when all of the facts in proof are bound together, the weak with the strong, they may create such an aggregate of strength as to defy refutation.

Nor is the absence of fraudulent intent necessarily established by the protestations of innocence of the parties, however vigorous. *Sydney M. Shoenberg*, 30 B. T. A. 659; affd., 77 Fed. (2d) 446; *William C. deMille Productions, Inc.*, 30 B. T. A. 826. It is to be gleaned from all the facts and the normal and reasonable inference therefrom. Though intent is a state of mind, its character is to be established, as other facts are established, by weighing all of the evidence and applying the proper measure of proof.

In this situation the trier of the facts is charged with the responsibility of passing on the credibility of the evidence. This duty involves the winnowing of the wheat of truth from the chaff of untruth—the sorting of the real from the seeming. This duty is not without its inherent difficulty. In cases such as this, almost without exception, the taxpayer testifies categorically to the purity of his motives and the absence of fraudulent intent. And if, on the whole record, he convinces those charged with decision of his forthrightness of purpose, his innocence of improper motive, the impenetrable honesty of his position—if neither contradictory circumstance nor inherent lack of probability weakens his credibility, he must prevail. On the other hand, if, after listening to the taxpayer's protestations of innocence and hearing his explanations of his conduct, the trier of the facts is unable to give such protestations full weight and such explanations full credence, if on the whole record of fact, inference, and circumstance there abides in the mind of the trier a conviction, based on clear and convincing evidence, that fraud has been committed, then the decision must be against him. *P. B. Fouke*, 2 B. T. A. 219; *L. Schepp Co.*, 25 B. T. A. 419.

The specific items in controversy for the year 1929 are the alleged sale by petitioner to his wife and the failure to report as income the large payment from the management fund.

The transaction with Mrs. Mitchell had its inception in an admitted desire and a purpose to reduce or obviate the payment of taxes. It has been said many times that there is nothing illegal or reprehensible in an honest effort to reduce taxes to the minimum required by law. *United States* v. *Isham*, 17 Wall. 496; *Bullen* v. *Wisconsin*, 240 U. S. 625; *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14. Theoretically, at least, there can be but one correct amount of tax due and it is in the ascertainment of this correct amount that most tax controversies have their origin. But the courts and the Board have also often said that a transaction solely designed to save taxes,

especially one between husband and wife, will be subjected to strict scrutiny to determine whether the transaction is real or is merely a pretense. *Commissioner* v. *H\ale*, 67 Fed. (2d) 561; *Carl P. Dennett*, 30 B. T. A. 49; *Joseph E. Uihlein*, 30 B. T. A. 399.

Before he took up with Mrs. Mitchell the question of a possible sale to her of the stock, petitioner had come to the conclusion, by whatever process of reasoning employed, that the payment of $666,-666.67 received from the management fund was not income. There remained approximately $2,800,000 in income which he desired to wipe out. He determined to accomplish this end by " registering a loss " (to use his words) on the 18,300 shares of National City Bank stock. He decided on a sale to his wife, subject to getting the advice of his attorney. In this matter petitioner protests that he would not have gone ahead had his attorney advised against such procedure, but here we are unable to give full weight to his declarations.

There are conceivable instances in which a taxpayer may shield himself behind the advice of counsel, but the facts in this case do not present such a situation. Petitioner was fully experienced in the business of making sales. It is not to be believed that he did not know the basic essentials of such a transaction, and that "A sale must rest on a genuine intention to dispose of property without reservation or evasion of mind." *Sidney M. Shoenberg, supra.* Moreover, despite his contention that he sought legal advice, intending to rely thereon, the record does not sustain such contention. Counsel told him the necessary requirements of a valid sale, and were these elements present in the facts we should hold the sale valid. However, petitioner did not reveal to counsel all of the necessary facts to enable him to advise definitely as to this particular sale, nor did counsel, with full knowledge of the facts, attempt or purport to advise petitioner to make the sale. By clear inference counsel suggested doubt as to the proposed sale. Moreover, petitioner did not choose to follow such advice as was given. Although counsel told him that a very carefully drawn agreement was necessary, petitioner determined to follow his usual practice and exchange letters with his wife. We are convinced that he had chosen his course of action and that he proceeded to follow it, notwithstanding the cautionary advice of counsel. "Advice of counsel " affords him no shelter from the consequences of his conduct under the facts in this case.

The record reveals many facts of consequence. At the time of the alleged sale Mrs. Mitchell's total resources amounted to less than a million dollars. The sale price of the stock approximated four million dollars. The total amount of cash in Mrs. Mitchell's hands consisted of some $32,000. The so-called " interest " due to petitioner

on account of the alleged sale amounted to approximately $196,000 per year. The dividends on the stock amounted to but $73,200 per year. The difference between these sums was furnished by petitioner to his wife, who in turn paid the same, and all money received as dividends, to petitioner. The stock was all pledged to secure a large loan with Morgan & Co.; therefore, no delivery was made or was possible. Though advised to notify Morgan & Co. of the alleged sale petitioner did not do so. Though advised that internal revenue stamps were required, no stamps were affixed. No bill of sale was executed. No payment on account of principal was ever made. There was no entry by Mrs. Mitchell on her books of any indebtedness to petitioner. Although Mrs. Mitchell claims to have bought in order to resell at a profit, she did not sell although the market improved to such an extent that she could have sold at a profit of three quarters of a million dollars, thereby nearly doubling her fortune.

That petitioner deemed himself the owner of the stock at all times appears by clear inference in his efforts to have the National City Co. recognize the validity of his claim for relief and assume his obligation on the stock. It is significant that he did not reveal to his business associates during these negotiations the alleged disposition of the stock nor suggest that the claim had been sold to his wife.

The alleged repurchase corroborates the plain deduction from the above facts. Though the market had fallen to $45 per share, the price at which petitioner " reacquired " the stock was $212 per share, the price at the time Mrs. Mitchell was alleged to have bought. This transaction occurred at a time when petitioner was insolvent to an amount of $3,000,000. Had the sale been real, the relief of Mrs. Mitchell from the burden of interest could more simply have been accomplished by releasing Mrs. Mitchell from the alleged obligation to pay interest.

Over against this array of circumstances, stand the protestations of petitioner that the entire transaction was bona fide; that the sale was actual; that title passed; and that the repurchase arose solely from petitioner's desire to protect his wife's separate estate. Explanations of some plausibility are offered of each step. But on the entire record of the transaction, according to each fact such weight as in our judgment it deserves, drawing such inferences as logically flow from each circumstance, we find ourselves impelled to the conclusion that petitioner never intended to part with title; that no real sale was made; and that at all times he was the true owner of the stock. We are of the opinion that the Government has proved by clear and convincing evidence that the transaction between petitioner and his wife was a sham, a mere pretense conceived and carried out for the fraudulent purpose of evading taxes. The petitioner sustained no loss on the

transaction and the alleged loss is disallowed. See *D. A. Belden*, 30 B. T. A. 601, and cases there cited; *Albert W. Finlay*, 17 B. T. A. 828.

The other item in the 1929 situation is the failure to report for taxation the sum of $666,666.67 received as a distribution from the management fund in July 1929. The primary facts as to this item may be briefly summarized. The National City Co. in 1921 established a bonus system for certain officers of the company under the name " Management Fund." It was continued from year to year and payments or distributions were made therefrom. Under corporate resolution the fund was built up by monthly accretions from profits. At the close of the current year, or at any time, or from time to time during the year, the executive committee was empowered to make distributions from the fund to the beneficiaries, one half in accordance with fixed percentages, and the remaining one half at the close of the year in such proportion as the committee should fix. The percentage of the president was fixed at 33⅓ percent of the entire fund and was not subject to the discretion of the committee. On January 3, 1929, the sum of $1,450,000 was distributed, petitioner receiving $483,333.33 of such sum. This was reported as income. There remained in the 1928 fund after such payment the sum of $140,938.98.

On July 1, 1929, petitioner received a distribution of $666,666.67 from the 1929 management fund.

There were additional accumulations in the fund through the months following, until November. There were no credits to the fund in November and December and the losses of the company during those months exceeded the profits earned during the first ten months of the year.

After various conferences in December 1929, initiated by petitioner, concerning the status of the fund and the payments therefrom, the recipients, including petitioner, signed the so-called " receipts ", by the terms of which the signer acknowledged that the payment " represented an overpayment  *  *  *  to be repaid from future additions to said management fund before [he became] entitled to any further payments therefrom." Book entries and corporate resolutions reflecting the action were made. ·

Petitioner did not report the sum so received from the management fund in his 1929 return.

On January 2, 1931, the sum of $140,938.98 remaining in the 1928 fund was distributed, petitioner receiving $50,515.53. This sum was not credited against the alleged overpayment for 1929. Subsequently the alleged obligation to repay was written down on the books of the company to $1.

That the payment received by petitioner was taxable as income seems beyond question. It was paid not as a loan or advance (cf.

*Lorenzo C. Dilks*, 15 B. T. A. 1294; *William H. Stayton, Inc.*, 32 B. T. A. 940), but without apparent qualification or restriction. *Siegel Co.*, 27 B. T. A. 62, and cases there cited. It was received and treated by the recipients as their own. It was not repaid during the taxable year or at any subsequent time. The changed condition in the finances of the company which led to the signing of the receipts was not anticipated and could not have been foreseen. The resolutions creating the fund and providing for its distribution did not provide for such a contingency. Nor did the signing of the receipts or the making of entries on the books of the company characterizing the payment as an overpayment subject to repayment out of future earnings alter the taxable character of the payment so received by petitioner. Its taxability was fixed at the time of payment. *North American Oil Consolidated* v. *Burnet*, 286 U. S. 517, and cases cited therein; *James M. Butler*, 19 B. T. A. 718; *Jackson* v. *Smietanka*, 272 Fed. 970; *Harry B. Hurd*, 12 B. T. A. 368; *T. W. Henritze*, 28 B. T. A. 1173; *Siegel Co.*, *supra*. None of the cases cited by petitioner present parallel situations or are authoritative here. He lays special emphasis on the case of *Gallin et al.* v. *National City Bank of New York et al.*, a case in the Supreme Court of New York County, New York, in which certain stockholders charged that the directors of the bank and the National City Co. had breached their statutory or common law duty in certain claimed respects, to the damage of the bank and the company. Among the alleged breaches were the establishment and distribution of management funds, it being claimed that the same resulted in the payment of exorbitant sums to officers and the waste and spoliation of corporate assets. Petitioner has culled certain expressions from the opinion of the court in that case which he claims sustain his position here in respect to the management fund. Singularly enough, respondent also points to certain statements of the court as strongly supporting his position.

We have examined the opinion with care and have come to the conclusion that it is neither pertinent nor authoritative in the case before us. There are expressions in the opinion which, taken from their context, seem to lend support to one side or the other in the present controversy but which, if read in their context and considered in the light of the questions involved and decided by the court, are found to be of no help in determining the taxability of the management fund payment.

When the " receipt " is subjected to study, it is readily seen that it created no definite obligation to repay. Any repayment was dependent wholly on the continuance of the fund and its future earnings. But the fund existed only from year to year. It was subject to

any corporate action that might be taken either extending it for another year, or, in corporate discretion, abolishing it entirely. The " receipt " was valueless without further action in its support, and was wholly dependent on future earnings. In no sense was it an enforceable, unqualified obligation to repay.

The conferences with counsel and other officers respecting the possibility of repayment, the signing of the receipts, the corporate action and the making of book entries were largely at petitioner's initiation and followed his own decision that the payment should not be considered as income. The springing into existence of these subsequently conceived facts in support of petitioner's determination already arrived at suggests the employment of deliberate artifice to give color to his action in not reporting the payment for taxation. They appear as mere gestures lacking in the spark of reality that distinguishes the genuine from the pretended.

When all the facts pertinent to this item are considered and it is noted that petitioner's tax accounting for 1929 was characterized by an apparent indifference to the right of the Government to receive its toll in the form of taxes; that all doubts were resolved against the Government; that the taxpayer omitted from income a large payment received and enjoyed by him and failed to reveal to the Government the fact of such payment, although, as he testifies, he considered its taxability a close question, and now defends such concealment on the patently lame excuse of a possible obligation to repay—when such a review is made—there can be little doubt as to the intent of the taxpayer. The omission of the item was due to an intention to defraud the Government of taxes. *M. Rea Gano*, 19 B. T. A. 518; *D. C. Clarke*, 22 B. T. A. 314; *Joseph Carroro*, 29 B. T. A. 646; *Charles F. Long*, 12 B. T. A. 488.

We conclude that the omission of the item of $666,666.67 from his tax return for 1929 was fraudulent.

When we examine the proof respecting the sale in 1930 and repurchase in 1931 of Anaconda Copper Co. stock we find a very different situation from that obtaining in the transaction involving National City Bank stock heretofore discussed.

Though the motive suggesting the sale was the reduction of taxes, as already pointed out, this motive alone does not condemn a sale. If the sale be actual, judged by the normal criteria of the law of sales, and there be nothing to indicate a lack of bona fides in the transaction, such a sale may give rise to a lawful deduction. The same law that requires the reporting of profit received on a sale of property allows the deduction of a loss suffered in such a transaction. The test is the reality of the claimed loss and the genuineness of the factors involved.

Although there is a certain parallelism between some phases of the two transactions, there are vital differentiating elements. There was in each case an alleged sale for tax purposes and a subsequent repurchase at approximately the same price. In this the transactions are similar, but there the resemblance appears to end. In the 1929 " sale " the facts failed to integrate with the legal principles on which a sale must rest. In the 1930 sale there is a reasonable and satisfactory integration of the facts and governing principles. The evidence reveals that the several persons concerned in the 1930 sale were motivated by lawful impulses and that the design was to accomplish lawful ends. The repurchase likewise is found to rest on a reasonable and normal basis. It was closed at the market. It is not shown by fact, circumstances, or inference to have been a part of a preconceived plan by which the semblance of reality was given to a transaction by the implicit terms of which title never was intended to pass.

We find the sale of Anaconda Copper stock to have been bona fide and lawful. Petitioner was, therefore, entitled to deduction of the loss so sustained. It follows that the claim of loss on this item afforded no basis for a finding of fraud.

We have indicated our conclusion that in 1929 petitioner conceived and carried out the alleged sale of National City Bank stock with the fraudulent purpose of evading taxes. This transaction involved various steps. On execution, each step became a part in a fraudulent plan and is stamped with the character of the plan. Among the steps taken were the arrangement to have the dividends paid to petitioner's wife and the return of the same by her for taxation. Since the stock was never sold these dividends at all times belonged to the petitioner. They should have been reported by him for taxation. Their omission from his return in 1930 in conformity with and in support of the fraudulent plan to evade taxes for 1929 is, in itself, fraudulent. Section 293 (b) of the Revenue Act of 1928 provides that " if any part of any deficiency is due to fraud with intent to evade tax * * * " the penalty shall apply to the whole of such deficiency. We conclude that the return of petitioner for 1930 was false and fraudulent with intent to evade tax.

We come now to the final issue. Petitioner asserts that the identical matters here in controversy were involved in the case of *United States* v. *Mitchell*, in which he was acquitted by a jury in the Federal District Court for the Southern District of New York, and that the verdict in that case constitutes a bar against a decision in this proceeding. He argues, in effect, that the imposition of the penalties prescribed in section 293 (b) of the Revenue Act of 1928, *supra*, would constitute a second punishment for the same offense for which he was

indicted and of which he was acquitted under the provisions of section 146 (b) of the same revenue act.[1]

A careful study of the two sections convinces us that they are basically different in character and were enacted for wholly different purposes. The language of the two sections differs widely and contemplates situations which may require entirely dissimilar proof.

Section 146 (b) is a statute defining a felony and establishing punishment and penalties for the commission of a crime. It is a punitive statute and prosecution thereunder is strictly a criminal proceeding initiated by the United States. Section 293 (b) imposes an additional 50 percent of the deficiency if any part of the deficiency is due to fraud with intent to evade the tax. Proceedings thereunder are civil in character and are initiated by the taxpayer. The penalties contained therein are likewise civil and were inserted in the taxing statutes to aid in collecting revenue. *Dorsheimer* v. *United States,* 7 Wall. 166; *Murphy* v. *United States,* 272 U. S. 630; *McDowell* v. *Heiner,* 9 Fed. (2d) 120. They become a part of the deficiency in tax and are collected in the same manner as the deficiencies. *Ely & Walker Dry Goods Co.* v. *United States,* 34 Fed. (2d) 429; *Thomas J. McLaughlin,* 29 B. T. A. 247.

In *William R. Scharton,* 32 B. T. A. 459, the situation resembled that now before us, with the exception that the indictment of the petitioner was quashed. We there said:

> Even if the quashing of the indictment in the criminal proceeding might be said to be a judgment of acquittal, it is not *res judicata* in this proceeding. It is not even admissible as evidence of the truth or falsity of the facts decided in the prior proceeding. See *Coffey* v. *United States,* 116 U. S. 436; *Stone* v. *United States,* 167 U. S. 178; 34 Corpus Juris 971; 15 R. C. L. 1000-1003, and cases cited.

Although the quoted statement was perhaps *obiter* in view of the question there presented, we believe it to be a correct statement of the law. *Stone* v. *United States,* 167 U. S. 178. We are of the opinion that the indictment and acquittal of petitioner under section 146 (b) in the Federal District Court do not stand as a bar to decision in this proceeding.

The respondent, on brief, raises a question of the burden and necessity of proof as to the fraud charges, directing attention to the fact that the petitioner failed to file a reply to the charges of fraud until after the close of the hearing in chief and the filing of respond-

[1] SEC. 146. PENALTIES.

(b) Any person required under this title to collect, account for, and pay over any tax imposed by this title, who willfully fails to collect or truthfully account for and pay over such tax, and any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, be fined not more than $10,000, or imprisoned for not more than five years, or both, together with the costs of prosecution.

ent's affirmative brief. In this situation he claims that the charges of fraud stand admitted under the pleadings and under the rules of the Board. Although our holding on the merits of the case probably makes this question academic, we deem it worthy of discussion.

The hearing was held April 30 to May 4, 1934. No motion for judgment on the issue of fraud was made at any time and the hearing was had and evidence was produced by the parties as though a reply to respondent's charges had been filed. On July 2, 1934, respondent filed his affirmative brief, in which he took the position that in the posture of the pleadings the charges of fraud stood admitted by petitioner. On July 20, 1934, petitioner filed a motion for leave to conform the pleadings to the proof or, in the alternative, to file a reply *nunc pro tunc*. On August 6, 1934, hearing with argument was had on the motion, at the conclusion of which the Division hearing the case granted the motion of petitioner for leave to file his reply denying respondent's allegations. The reply was forthwith filed.

We deem the action of the Division in permitting the filing of the reply to have been a proper exercise of its discretion and to dispose effectively of respondent's contention. The rules of the Board were thereby satisfied and the burden and requirement of proof rest normally. The burden of proving fraud rested on the Government. *James Nicholson*, 32 B. T. A. 977.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

BLACK, TRAMMELL, ARUNDELL, and LEECH concur in the result reached in the majority opinion and, while agreeing that the item of $666,666.67 received by petitioner as a distribution from the management fund in July 1929 constituted taxable income to him in that taxable year, do not agree that the evidence establishes fraud as to this item.

---

McMAHON, concurring in part and dissenting in part:

## I.

The parties stipulated as follows:

105. On April 25, 1933, an indictment was returned against petitioner by a Grand Jury of the District Court of the United States for the Southern District of New York. (Ex. 59.) To both counts in that indictment the petitioner entered a plea of not guilty.

106. Thereafter, petitioner was tried upon the charges contained in said indictment before Judge Henry W. Goddard and a trial jury in the said United

States District Court, the trial commencing May 11, 1933, and terminating on June 22, 1933. A copy of the court's charge to the jury is contained in Ex. 60.

107. On June 22, 1933, a verdict of not guilty was returned by the jury on all counts of the indictment. A copy of the docket entries is Ex. 61.

They stipulated further upon the same subject:

That the issues so actually tried were those disclosed by the averments of the indictment; that evidence was offered by the Government in support of each of those charges and by defendant against each thereof and was received upon the trial and that for the purposes of this case the Government will not at any stage thereof raise the objection that those issues were not sufficiently identified by the indictment, plea and charges.

Further stipulations on this subject immediately following the foregoing last unnumbered stipulation are omitted herein the interest of brevity as they neither add to nor detract from the foregoing stipulations.

The indictment and the plea of "not guilty" involve the same identical acts and intents of the petitioner and the same identical transactions and the same identical issues of fact as to whether the petitioner committed fraud, and the same identical, essential details and figures.

It is obvious from the findings of the majority and the whole of the record in the instant proceeding that the trial of the issues of fact which were presented in the proceedings in the United States District Court followed the same lines as the trial of the issues of fact in this proceeding. Because of the development of the proof in the District Court, the parties were able to stipulate over 100 paragraphs of items of fact, consisting in the neighborhood of 35 pages of stipulated facts, nearly all of which were printed, and to this extent stipulations were received in evidence, with numerous voluminous exhibits, in addition. With the exception of the testimony of petitioner's wife, who testified in this proceeding but did not testify in the District Court, the proof there and here as to the vital facts was substantially the same; and in some instances testimony of witnesses called in the District Court was by stipulation offered in evidence in this proceeding without producing the witnesses. These stipulations of the parties in this proceeding enabled the Board to commence the taking of evidence in this proceeding on April 30, 1934, and complete it on May 4, 1934, whereas the trial in the District Court was commenced on May 11, 1933, and completed on June 22, 1933.

The pleadings there and here and the charge of the District Court to the jury likewise show the close similarity of the issues of fact which were presented there as compared with the issues of fact which are presented here in respect to whether the petitioner committed fraud.

The statute, section 146 (b), Revenue Act of 1928, under which petitioner was indicted, tried and acquitted in the District Court provides that any one that " willfully attempts in any manner to evade or defeat any tax " is " guilty of a felony " and punishable by fine or imprisonment or both. The statute, section 293 (b), Revenue Act of 1928, which the respondent invokes in this proceeding provides that if any portion of a " deficiency is due to fraud with intent to evade tax " 50 per centum of the total of the deficiency shall be imposed and paid in addition to the deficiency. The language " due to fraud with intent to evade tax " is comprehended by the language " willfully attempts in any manner to evade * * * tax." The language " in any manner " includes a fraudulent " manner." *United States* v. *Miro*, 60 Fed. (2d) 58; *Paschen* v. *United States*, 70 Fed. (2d) 491. Fraudulent manner comprehends that which is " due to fraud." The language " willfully attempts " comprehends " with intent." He who willfully " attempts " to do a thing does it " with intent." He can not attempt to do it without intending to do it. The words " to evade " are identical in both statutes. To charge a person with a deficiency in tax " due to fraud with intent to evade tax " is comprehended in a charge that he " willfully attempts in any manner to evade * * * tax." All of the charges made by the Government in the District Court and here upon the subject of fraud are to the effect that he is guilty of fraud " to evade tax." In the last analysis this is the issue with which we are confronted in this proceeding and it is the issue which the court and jury were confronted with in the District Court. The purpose " to evade tax " is common to the proceedings there and here and in the last analysis it is the determinative issue there and here. It was incumbent upon the Government there to prove the petitioner guilty of a purpose " to evade tax " and it is likewise incumbent upon the Government here to prove the same purpose. The purpose " to evade tax " is an essential element in the charges made there and here. It is plain that the Government could not have prevailed there without proving such purpose and the Government should not prevail here without proving such purpose. Without proof of such purpose here as well as there, even though all other elements embraced within both statutes be established, the Government should not succeed under either statute. The question there and here of the existence of such purpose involves the same " acts, attempts and intents " and " facts." The indictment charged the petitioner with fraudulently attempting " to evade tax ", and the court instructed the jury to the effect that before finding him guilty they must be satisfied from the evidence that he did act fraudulently.

No consequences can be visited upon any person under either statute without a finding of such purpose, by a jury in a United States District Court, or by the Board in a proceeding of this character. No such finding was made by the jury in the District Court and, as more fully pointed out herein, no such finding by the Board is justified by the record in this proceeding. When such finding of such purpose is justified and made and all other elements required by the statutes have been established the consequences that flow from such finding are somewhat different, as pointed out more fully herein; but any differences in such consequences are not determinative here, *Coffey* v. *United States, infra.*

The real question here in this respect is as to whether the final adjudication of a court and jury exonerating petitioner of a purpose " to evade tax " is a bar against the making of a finding and adjudication by this Board to the contrary; in other words, whether the adjudication of the District Court with the aid of a jury operates as a bar by way of *res judicata* here; and under the principles as laid down and the reasoning therefor as expounded by the Supreme Court of the United States in *Coffey* v. *United States*, 116 U. S. 436, and elsewhere, as herein pointed out, the adjudication of the District Court with the aid of the jury is a bar by way of *res judicata* here.

*Coffey* v. *United States, supra,* involved an information filed by the United States against certain distilled spirits and distilling apparatus which were under seizure as being forfeited to the United States under the provisions of sections 3257, 3450, and 3453 of the Revised Statutes of the United States. Coffey filed a claim to all the property except one barrel of the spirits, and by way of answer set up, as a bar, the verdict of a jury finding him not guilty and the judgment of the court acquitting him in a criminal information involving the same acts and circumstances and the same statutes as are above referred to, and, in addition, sections 3256, 3296, and 3452 of the Revised Statutes. The Supreme Court, in holding that the judgment of acquittal operated as a bar to the suit for forfeiture, stated in part:

The principal question is as to the effect of the indictment, trial, verdict and judgment of acquittal set up in the fourth paragraph of the answer. The information is founded on §§ 3257, 3450 and 3453, and there is no question, on the averments in the answer, that the fraudulent acts and attempts and intents to defraud, alleged in the prior criminal information, and covered by the verdict and judgment of acquittal, embraced all of the acts, attempts and intents averred in the information in this suit. The question, therefore, is distinctly presented, whether such judgment of acquittal is a bar to this suit. We are of opinion that it is.

It is true that § 3257, after denouncing the single act of a distiller defrauding or attempting to defraud the United States of the tax on the spirits distilled by him, declares the consequences of the commission of the act to be (1) that certain specific property shall be forfeited; and (2) that the offender

shall be fined and imprisoned. It is also true that the proceeding to enforce the forfeiture against the *res* named must be a proceeding *in rem* and a civil action, while that to enforce the fine and imprisonment must be a criminal proceeding, as was held by this court in *The Palmyra*, 12 Wheat. 1, 14. Yet, where an issue raised as to the existence of the act or fact denounced has been tried in a criminal proceeding, instituted by the United States, and a judgment of acquittal has been rendered in favor of a particular person, that judgment is conclusive in favor of such person, on the subsequent trial of a suit *in rem* by the United States, where, as against him, the existence of the same act or fact is the matter in issue, as a cause for the forfeiture of the property prosecuted in such suit *in rem*. *It is urged as a reason for not allowing such effect to the judgment, that the acquittal in the criminal case may have taken place because of the rule requiring guilt to be proved beyond a reasonable doubt, and that, on the same evidence, on the question of preponderance of proof, there might be a verdict for the United States, in the suit in rem. Nevertheless, the fact or act has been put in issue and determined against the United States; and all that is imposed by the statute, as a consequence of guilt, is a punishment therefor. There could be no new trial of the criminal prosecution after the acquittal in it; and a subsequent trial of the civil suit amounts to substantially the same thing, with a difference only in the consequences following a judgment adverse to the claimant.*

\* \* \* \* \* \* \* \*

*This doctrine* [the doctrine of res judicata laid down in *Gelston* v. *Hoyt*, 3 Wheat., 246] *is peculiarly applicable to a case like the present, where, in both proceedings, criminal and civil, the United States are the party on one side and this claimant the party on the other.* The judgment of acquittal in the criminal proceeding ascertained that the facts which were the basis of that proceeding, and are the basis of this one, and which are made by the statute the foundation of any punishment, personal or pecuniary, did not exist. This was ascertained once for all, between the United States and the claimant, in the criminal proceeding, so that the facts cannot be again litigated between them, as the basis of any statutory punishment denounced as a consequence of the existence of the facts. \* \* \* [Emphasis supplied.]

The *Coffey* case, while it may not be followed by some state courts, is binding upon all branches of the Federal Government until the Supreme Court overrules it or Congress enacts legislation to the contrary. In *United States* v. *Seattle Brewing & Malting Co.*, 135 Fed. 597, which follows the *Coffey* case, it is stated:

\* \* \* In later decisions by the Supreme Court the *Coffey* case has been referred to, but without modifying or departing from the rule which it established. See *Stone* v. *United States*, 167 U. S. 178, 196, 17 Sup. Ct. 778, 42 L. Ed. 127. \* \* \*

The *Coffey* case was also followed in *National Surety Co.* v. *United States*, 17 Fed. (2d) 369.

In the instant proceeding we are concerned with a penalty, while in *Coffey* v. *United States* the Court was concerned with a forfeiture. However, there is no substantial difference between the forfeiture there involved and the penalty here involved. Both are of a penal nature. Both contain elements of punishment. They are sometimes

used synonymously. The word "forfeiture" is defined in Black's Law Dictionary, 3d Ed., as follows:

The incurring a liability to pay a definite sum of money as the consequence of violating the provisions of some statute, or refusal to comply with some requirement of law. *State* v. *Marion County Comm'rs.*, 85 Ind. 493.

A thing or sum of money forfeited. Something imposed as a punishment for an offense or delinquency. The word in this sense is frequently associated with the word "penalty". *Van Buren* v. *Digges*, 11 How. 477, 13 L. Ed. 771; *Bryant* v. *Rich's Grill*, 216 Mass. 344, 103 N. E. 925, 927. Ann. Cas. 1915B 869; *Miller* v. *Bopp*, 136 La. 788, 67 So. 831; *Jones* v. *State*, 10 Okl. Cr. 216, 136 P. 182, 183; *Missouri, K. & T. Ry. Co.* v. *Dewey Portland Cement Co.*, 113 Okl. 142, 242 P. 257, 259.

In *United States* v. *Chouteau*, 102 U. S. 603, the Supreme Court stated:

The term "penalty" involves the idea of *punishment*, and its character is not changed by the mode in which it is inflicted, whether by a civil action or a criminal prosecution. [Emphasis supplied.]

The case of *Stone* v. *United States*, 167 U. S. 178, is not applicable to this proceeding. The distinction between that case and *Coffey* v. *United States*, *supra*, there made by the Supreme Court is as follows:

The present action is unlike that against Coffey. This is not a suit to recover a penalty, to impose a punishment, or to declare a forfeiture. The only relief sought here is a judgment for the value of property [timber on Government lands] wrongfully converted by the defendant. The proceeding by libel against Coffey, *although civil in form, was penal in its nature*, because it sought to have an adjudication of the forfeiture of his property for acts prohibited. It was, as we have seen, a case in which a punishment, denounced by statute, was sought to be inflicted as a consequence of *the existence of facts that were in issue and had been finally determined* against the United States in a criminal proceeding. * * * [Emphasis supplied.]

In *Chantangco* v. *Abarao*, 218 U. S. 476, the Supreme Court stated:

There are peculiarities about the character of the action now under consideration which, as will appear later, may bring it under the principles of *Coffey* v. *United States*, *supra*, rather than *Stone* v. *United States* (*supra*) the indemnification here sought being a part of the punishment attached to the offense of which the defendant has been acquitted.

In *United States* v. *LaFrance*, 282 U. S. 568, the United States Supreme Court stated as follows:

* * * A "tax" is an enforced contribution to provide for the support of government; a "penalty", as the word is here used, is an exaction imposed by statute as punishment for an unlawful act. The two words are not interchangeable one for the other. No mere exercise of the art of lexicography can alter the essential nature of an act or a thing; and if an exaction be clearly a penalty it cannot be converted into a tax by the simple expedient of calling it such. That the exaction here in question is not a true tax, but a penalty involving the idea of punishment for infraction of the law is settled by *Lipke* v. *Lederer*, 259 U. S. 557, 561–562 * * *. See also *Regal Drug Corp.* v. *Wardell*, 260

U. S. 386, * * *. There is nothing in *United States* v. *One Ford Coupe*, 272 U. S. 321 * * *, or *Murphy* v. *United States*, 272 U. S. 630, * * * to the contrary. The first of these cases was a proceeding to forfeit an automobile because used in violation of law; the other was a suit in equity to enjoin the occupation and use of premises for a year because used in the commission of offenses under the National Prohibition Act, and to abate the maintenance as a nuisance. *The distinction made by these four cases is that in the first two, the purpose of the proceedings was punishment; while as to the other two, the purpose in the first case was to enforce a simple tax, not one which had been, as here, converted, by a change of its nature, into a penalty, and in the second case the purpose was prevention.* *Murphy* v. *United States, supra* page 632 of 272 U. S. * * *. [Emphasis supplied.]

See discussion of "tax" in *United States* v. *Glidden Co.*, 78 Fed. (2d) 639.

Section 146 (b), *supra*, expressly provides that the penalties therein prescribed, fine or imprisonment or both, shall be "in addition to other *penalties* provided by law." (Emphasis supplied.) The only other *penalty* thus provided for any of that which is denounced in section 146 (b) is the *penalty* of 50 per centum of the deficiency prescribed by section 293 (b), *supra*. Both subsections deal with the same taxation and are a part of the statutory scheme of such taxation.

The case of *Murphy* v. *United States*, 272 U. S. 630, is not in point. There was not involved in that case any penalty, punishment or forfeiture such as was involved in *Coffey* v. *United States, supra*, and is involved in the instant proceeding. That case is analogous to *Stone* v. *United States, supra*, whereas the instant proceeding is analogous to *Coffey* v. *United States*. It was held in *Murphy* v. *United States, supra*, that a prior acquittal of the maintenance of a nuisance under the National Prohibition Act was not a bar to a suit in equity for the abatement of a nuisance and an injunction, since the purpose of the latter "is *prevention*, not a second punishment that could not be inflicted after acquittal from the first." (Emphasis supplied.) *Murphy* v. *United States* and *Stone* v. *United States, supra*, each involved a civil suit, which is in the latter case distinguished from *Coffey* v. *United States*, a quasi criminal proceeding. The instant proceeding, like *Coffey* v. *United States*, though civil in form, is quasi-criminal. It involves the recovery of a penalty and as such "is unquestionably criminal in its nature." *Lees* v. *United States*, 150 U. S. 476, 480; *Boyd* v. *United States*, 116 U. S. 616. In Black's Law Dictionary, *supra*, "quasi crimes" are defined as follows:

This term embraces all offenses not crimes or misdemeanors, but that are in the nature of crimes,—a class of offenses against the public which have not been declared crimes, but wrongs against the general or local public which it is proper should be repressed or punished by forfeitures and penalties. This

would embrace all *qui tam* actions and forfeitures imposed for the neglect or violation of a public duty. A quasi crime would not embrace an indictable offense, whatever might be its grade, but simply forfeitures for a wrong done to the public, whether voluntary or involuntary, where a penalty is given whether recoverable by criminal or civil process. *Wiggins* v. *Chicago*, 68 Ill. 375. * * *

The case of *Hanby* v. *Commissioner*, 67 Fed. (2d) 125, is distinguishable. There the acquittal of the taxpayer relied upon as a bar, under the doctrine of *res judicata*, to the imposition of fraud penalties with respect to *original* Federal tax returns, was an acquittal upon an indictment charging willful attempts to defeat and evade with reference to *amended* returns. As correctly pointed out by the court, there can be no estoppel by judgment where the former and subsequent case do not involve the same claim or demand, or the same point or question. A portion of the opinion of the court in *Hanby* v. *Commissioner*, *supra*, deals with the doctrine of double jeopardy, a second question there presented; and is not applicable here, as we are not here confronted with a double jeopardy.

The fact that the present proceeding is an entirely separate proceeding from that against this petitioner in the District Court does not preclude the application of the doctrine of *res judicata*. The doctrine applies as to the facts, questions, rights or issues involved under the circumstances and conditions here, which are the same facts, questions, rights, or issues involved in that proceeding under the same circumstances and conditions. *Tait* v. *Western Md. Ry. Co.*, 62 Fed. (2d) 973; affd., 289 U. S. 620; and *Charles P. Leininger*, 29 B. T. A. 874.

It is sufficient if the evidence present in the instant proceeding was available in the criminal proceeding before the court. *Tait* v. *Western Md. Ry. Co.*, 62 Fed. (2d) 973, *supra*, and *Charles P. Leininger*, *supra*. Here there is no showing that any of the evidence presented in the instant proceeding was not available for presentation in the District Court. On the contrary, it appears that some of the testimony in the instant proceeding, but not in the record of the District Court, was just as available at the time of the trial in the District Court as at the hearing before the Board.

*Res judicata* is a species of equitable estoppel. *Charles P. Leininger*, *supra*, and *Tait* v. *Western Md. Ry. Co.*, 289 U. S. 620, *supra*. It embraces estoppel by judgment and by verdict. 34 C. J. 745.

In *Appeal of Union Metal Manufacturing Co.*, 4 B. T. A. 287, we stated in part as follows:

The doctrine of *res judicata*, the matter adjudged, supposes the finality of the determination so that it may *put an end to litigation of the same controversy.* [Emphasis supplied.]

In *Coffey* v. *United States, supra*, the Supreme Court of the United States pointed out that this doctrine of *res judicata* " is peculiarly applicable to a case like the present, where in both proceedings, criminal and civil, the United States are the party on one side and this claimant the party on the other ", and after expressly rejecting the contention that the doctrine should not be therein applied on the ground " that the acquittal in the criminal case may have taken place because of the rule requiring guilt to be proved beyond a reasonable doubt."

There may be something of a twilight zone between the rule requiring, of the party bearing the burden, proof of guilt of fraud beyond a reasonable doubt on the one side and the rule requiring, of the party bearing the burden, proof of guilt of the same fraud by a preponderance of evidence and by clear and convincing evidence on the other side. (*Henry S. Kerbaugh*, 29 B. T. A. 1014, *infra*) ; but in view of what the Supreme Court said on this subject in *Coffey* v. *United States, supra*, it is unnecessary to here further explore such twilight zone, if any.

All of the salutary, underlying principles of justice upon which the doctrine of equitable estoppel by *res judicata* are based, 34 C. J. 743, 744 and 15 R. C. L. 954, 955, and which are grounded in sound public policy, call for the application of that doctrine to the instant proceeding, in view of the record and undisputed facts and circumstances here, which, among other things, discloses fully the record in the District Court in *United States* v. *Charles E. Mitchell*, who was the defendant there and is the petitioner here.

Upon the authorities heretofore pointed out and for the reasons heretofore indicated herein, I am constrained to respectfully dissent from the finding and holding of the majority to the effect that the adjudication of that court with the aid of a jury does not operate as a bar by way of *res judicata* in this proceeding.

The authorities cited by the majority do not justify, much less require, the conclusion they have reached in this respect. No sound reasons have been advanced to justify not following *Coffey* v. *United States, supra*, with all of its implications.

It is elementary that taxation is eminently practical, we are here concerned only with tax statutes; and practical considerations require that when a controversy involving fraud under these statutes, such as was terminated by the District Court with the aid of a jury, is terminated, it remain terminated. The doctrine of *res judicata* is sometimes called the " doctrine of peace." 34 C. J. 744.

It may not be amiss to observe that, if there had been an adjudication by the District Court with the aid of a jury convicting the peti-

tioner of fraud, such adjudication likewise would have been a bar by way of *res judicata* here. Assuming such conviction and also imprisonment, and that, while he was serving his sentence, the Board, on substantially the same facts and circumstances upon which the jury convicted him and the court imprisoned him, found and held that he had not committed the fraud found by the jury, an incongruous situation would be presented. The doctrine of *res judicata* would avert that sort of thing.

## II.

Under section 907 (a) of the Revenue Act of 1924 the burden of proving fraud on the part of the petitioner in each instance rests upon the respondent; and this burden carries with it the obligation of proving such fraud, as set forth by the Board in *Henry S. Kerbaugh*, 29 B. T. A. 1014; affd., *Commissioner* v. *Kerbaugh*, 74 Fed. (2d) 749, as follows:

* * * A charge of fraud has always been regarded as a serious matter in the law. Not only is it never presumed, but the ordinary preponderance of evidence is not sufficient to establish such a charge. It must be proved by clear and convincing evidence. * * *

Under all of the facts and circumstances presented by the record in this proceeding it can not, with justification, be found or held, as the majority in effect has found and held, that the petitioner was guilty of fraud in the respects stated by the majority, in view of the fact, which is also found as a fact by the majority, that a District Court of the United States, with the aid of a jury of his peers, 12 laymen, acquitted the petitioner of all of the same charges of fraud, upon substantially the same facts and circumstances as are presented here. The verdict of the jury at the very outset must give us pause; and with that verdict in the record, as we have it here, fortified by such facts and circumstances, it can not, with justification, be found and held that the petitioner has been proven guilty of fraud by such clear and convincing evidence as is required by the principles of the *Kerbaugh* case. These principles should be closely adhered to here; the penalty approved by the majority, in principal alone, for the one year 1929 is approximately 36 times as great as the maximum of the fine which the court could have imposed if there had been a conviction for fraud for that year. This is a drastic penalty.

Too, the petitioner made out a stronger case here, due to the fact that his wife testified fully in the instant proceeding in corroboration of petitioner's testimony and otherwise. Contrary to her desires, she did not testify in the District Court, but she was just as accessible there as here.

It is true that the author of the majority report is at an advantage over all the other members of the Board as now constituted in that the author heard the witnesses and had the advantage of observing them upon the stand, but the twelve jurors had the same advantage; and none of the witnesses was impeached, and considerable of the proof is in the form of stipulations and records; and, in view of the whole record, any advantage in this respect is of little consequence.

So, irrespective of whether the adjudication of the District Court with the aid of a jury is conclusive upon the Board as a bar under the doctrine of *res judicata*, the respondent, in view of the exoneration of the petitioner of all fraud by the court and jury, has not, under all the facts and circumstances presented here, discharged his burden of proof that petitioner committed fraud by clear and convincing evidence, as required of respondent under the principles of the *Kerbaugh* case.

### III.

I agree with the majority that there was no fraud committed by the petitioner in connection with the sale on December 26, 1930, of the 8,500 shares of Anaconda Copper Mining Co. stock to Thornton. As to this transaction the Board is unanimous in reaching the same result the District Court reached with the aid of the jury. If the vital evidence in that transaction be compared step by step with the vital evidence of the transaction between the petitioner and his wife through the repurchase by the petitioner, such comparison leads to the conclusion that the finding and holding that the petitioner committed fraud in connection with the sale to his wife of the 18,300 shares of National City Bank stock on December 20, 1929, is inconsistent with the finding and holding of the majority that the petitioner was free from fraud in the transaction with Thornton. There are no vital differences between these two transactions. Looking to substance and not to form, as we must do, the vital controlling determinative evidence as to the sale made by petitioner to his wife is similar to that as to the sale through his friend Ryan to their mutual acquaintance Thornton, whose attitude was friendly to both. Petitioner was a party to both transactions. Both sales were made just before the close of taxable years for the purpose of establishing deductible losses by disposing of the stocks. As to each no questions are raised about the acquisition of the stock or the basis of the loss, which is actual cost in money. Both sales were at open market prices. As to each, for all practical purposes, before the sale a real depreciation readily measurable with certainty had been experienced by petitioner in the tax year before us, with the result that petitioner was out of pocket heavily with an asset on hand having a

market value considerably below the money cost. Both purchases were made upon the credit of the purchasers. Neither purchaser paid out any unborrowed money of his or her own in payment of the purchase price. Both paid considerable interest at current rates on the amounts of the purchase prices. Both purchasers were owners, previously, of the same kind of stock. Federal stock transfer stamps were ultimately paid for on the transfers of both stocks. Both stocks were carried in the names of the nominees. As to each all dividends paid were paid to the nominees and by them paid over or fully accounted for to the purchaser as owner of the stock purchased. Each purchaser could have sold at a profit but did not choose to do so (and could not have been required to do so), obviously because of the expectation of a better rise in the market. As to each stock petitioner, long after the expiration of 30 days, repurchased the same number of shares of stock from the person to whom he had sold the stock, thereby relieving that person of the stock at a loss to such person. Both repurchases were on a basis whereby petitioner saved the purchasers nearly whole. Petitioner relied upon the advice of the same legal counsel in the making of both sales. Both sales were made with the mutual intention of transferring absolute title to the purchasers. Both sales were made for the purpose of enabling the purchasers to derive a profit therefrom. No bill of sale was used in either sale. Substantially similar formalities were resorted to in both sales; and notices were given to all who had a right to be notified. As to each it was not necessary to publicize the sales. As to both such publicity might have proven disastrous to the stockholders and creditors, including the depositors of the bank, of the corporations involved. All of the delivery of the shares that was possible or necessary was made in connection with each sale. Cf. *Tracy* v. *Commissioner*, 70 Fed. (2d) 930. All of the control of each stock which petitioner possessed passed from petitioner to the purchaser. In each instance Morgan & Co. held the stock as collateral, and was at the time of the sale adequately secured.

### IV.

In some respects the proof as to the bona fides of the sale to petitioner's wife is more favorable. Petitioner's wife reported as income all of the dividends received by her in 1930 and subsequently on the stock which he sold her. In her income tax returns for 1930 and subsequently she deducted all interest paid to him in that year on the purchase price of the stock. An entry of the sale under date of the sale was made in due course in her ledger. She paid him over a quarter of a million dollars on account of the sale made to her in

excess of the dividends received by her on the stock and over $6,000 of this excess was exclusive of any gifts received by her from him. She had had numerous previous business transactions with petitioner over a considerable period of time, and had taken losses as well as profits on them. She had had similar transactions with others. She was financially responsible. Her overdrafts upon her bank were covered by securities. Her agreement embodied in the letters to pay the purchase price were just as binding as if she had given promissory notes therefor.

The sale of the 18,300 shares of National City Bank stock made by the petitioner to his wife on December 20, 1929, was a bona fide sale, and the loss resulting therefrom sustained by the petitioner is deductible under section 23 (e) of the Revenue Act of 1928 upon the authority of the following cases: *Commissioner* v. *Hale*, 67 Fed. (2d) 561, affirming memorandum opinion of the Board rendered April 20, 1932; *Joseph E. Uihlein*, 30 B. T. A. 399; and *Carl P. Dennett*, 30 B. T. A. 49. See *Thomas W. Behan*, 32 B. T. A. 1088; *Benjamin T. Burton*, 28 B. T. A. 1242; *Andrew J. Peters*, 28 B. T. A. 976; *Frank B. Gummey*, 26 B. T. A. 894; and *Merritt J. Corbett*, 16 B. T. A. 1231.

The instant proceeding is distinguishable from the following cases insofar as they bear upon the bona fides of the sales involved therein: *Albert W. Finlay*, 17 B. T. A. 828; *Luella Hoyt Slayton*, 29 B. T. A. 931; *Lulu Tirrill Coombs*, 30 B. T. A. 35; *Joseph Blumenthal*, 30 B. T. A. 125; *W. E. Brochon*, 30 B. T. A. 404; *D. A. Belden*, 30 B. T. A. 601; *Sydney M. Shoenberg*, 30 B. T. A. 659; *James W. Singer*, 32 B. T. A. 177; and *James Nicholson*, 32 B. T. A. 977.

Since the sale of December 20, 1929, was a bona fide sale, the petitioner did not commit fraud in the making of the sale. However, even if we assume for the purpose of this discussion that such sale was not a bona fide sale, there still remains the question as to whether or not the petitioner committed fraud in the making of the sale. *James Nicholson, supra*. The evidence in the record does not justify a finding or holding that the petitioner committed such fraud. As stated in *James Nicholson, supra*:

Here fraud is not admitted. The mere fact that his return showed a net income for the taxable year 1929 in the sum of $40,424.66 and the respondent, in recomputing his tax liability, determined that the net income for that year was $73,435.38, by itself, does not establish fraud. If it did, then all taxpayers against whom deficiencies are determined would be guilty of fraud and subject to the imposition of a fraud penalty. Nor does the lack of evidence to sustain the petitioners' contentions prove fraud. As stated in *L. Schepp Co., supra*, "both parties may fail through inadequate proof in their several issues, and thus the deficiency would be sustained and the penalty set aside." The burden of proving fraud is upon the respondent and his proof must be clear and convincing. * * *

That a sale was made for the purpose of reducing income taxes does not invalidate such sale. It has been so held repeatedly by the Board and the courts. In *Helvering* v. *Gregory*, 69 Fed. (2d) 809, the court stated:

We agree with the Board and the taxpayer that a transaction, otherwise within an exception of the tax law, does not lose its immunity, because it is actuated by a desire to avoid, or, if one choose, to evade, taxation. Any one may so arrange his affairs that his taxes shall be as low as possible; he is not bound to choose the pattern which will best pay the Treasury; there is not even a patriotic duty to increase one's taxes. *U. S.* v. *Isham*, 17 Wall. 496, 506 * * *; *Bullen* v. *Wisconsin*, 240 U. S. 625, 630 * * *.

To the same effect see *Gregory* v. *Helvering*, 293 U. S. 465, affirming *Helvering* v. *Gregory, supra; Chisholm* v. *Commissioner*, 79 Fed. (2d) 14; and *Joseph E. Uihlein, supra.*

The fact that the petitioner exchanged letters with his wife in the usual way indicates that he did not have fraud in his mind. Cf. *James W. Singer, supra.*

The majority discredits the petitioner's statement that he would not have gone ahead with the sale to his wife had his attorney advised against it upon the assumption that he did not follow the advice of his counsel in some respects. His counsel assisted him in the preparation of the agreements in the form of letters, and the whole of the record discloses that his counsel finally concluded that it was not necessary for the petitioner to give notice of the sale to Morgan & Co. Furthermore, his failure to give such notice is fully explained and justified by the evidence. His failure to affix revenue stamps was due wholly to oversight. The undisputed proof is that he discussed with his attorney everything that it was necessary for him to discuss or to disclose so as to enable his attorney to render an opinion. While he did not state the precise amount of the net worth of his wife, he did state that she was financially responsible and his attorney accepted that as being true. Bearing in mind that the stock had a market value and that it was expected that the market value would increase, the financial responsibility of Mrs. Mitchell was sufficiently adequate to repel the charge of fraud as against the petitioner. It is common knowledge that property, real and personal, is frequently purchased on credit even by persons with considerably less resources, comparatively, all with the expectation of paying therefor out of future income or out of proceeds on resale; and this does not constitute fraud. A sale made on credit is as valid a sale as one made for cash. No bill of sale was necessary to validate the sale. The petitioner had the right to make gifts to his wife. He had also made gifts to her previous to the sale. In *Thomas W. Behan, supra,* the Board stated:

* * * If the transfer of funds from the petitioner to his wife were unexplained, that would not afford sufficient reason in this case for denying the

*losses to the petitioner. Frank M. Arguimbau,* 31 B. T. A. 604. Here the parties have stipulated, however, that the petitioner made certain gifts of money to his wife. There is a companion case to this one wherein the wife is claiming deductions for losses under similar circumstances. The statement of facts in that case shows that she returned to her husband some of the amounts which he advanced to her and also at times transferred funds from her bank account to his bank account apparently for the purpose of enabling him to make contemporaneous purchases of securities. *The fact that this husband and wife aided one another in this way is not, in view of the other facts in the case, a reason for denying the petitioner deductions for his losses.* [Emphasis supplied.]

See also *Benjamin T. Burton, supra;* and *Merritt J. Corbett, supra.*

The stock was entered in Mrs. Mitchell's ledger. Whether or not the debt for the purchase price was entered is immaterial in view of the fact that it has not been shown that Mrs. Mitchell kept an elaborate system of books, showing all her liabilities, as well as her investments. Furthermore, it is elementary that the facts are controlling and not the presence or absence of book entries.

The petitioner's further purpose in selling the stock to his wife was to give her an opportunity to make a profit and also to avoid dumping the stock on the market to the detriment of the bank and of the National City Co. He did not want her to sustain a loss and his repurchase at the same price at which he had sold it to her under all the facts and circumstances is such a natural act based upon human experience, that a charge of bad faith or fraud on that score is untenable.

Mrs. Mitchell's failure to sell is founded upon her belief that the stock would regain more of its former value. That she waited too long is an error of judgment and is not indicative of bad faith or fraud on the part of the petitioner.

The record discloses that the petitioner did inform some of his associate directors that he had sold the stock to his wife. Harry W. Forbes of the law firm acting as general counsel for the National City Bank and for the National City Co. knew of the sale and advised petitioner thereon. Guy Cary of the same firm also had knowledge of the sale, as appears from the findings of the majority that he advised the petitioner in reference to the debt of Mrs. Mitchell arising from such sale. Others were so informed. It is not customary and there was no legal obligation resting upon the petitioner to broadcast, or to keep all of his business associates informed, regarding his dealings with his wife or others.

The fact that the petitioner presented a claim for a loss sustained on account of his purchase of the 18,300 shares of National City Bank stock to the National City Co. is not determinative here, under all the facts and circumstances. His financial affairs had become very much involved. In the first instance he merely presented the claim for

consideration. His counsel advised him he had a valid claim. The company's counsel advised the company merely that he had no "legal" claim but did question the justice of his claim. Upon the legality of his claim being thus questioned he withdrew it. Furthermore he first discussed the matter of making such claim with Guy Cary, whom the petitioner had previously informed of the sale to his wife.

The cases cited by the majority in support of its finding and holding that fraud was committed by petitioner are distinguishable upon the facts.

Although petitioner repurchased the stock, this is no proof of fraud, nor does a repurchase invalidate a sale. Under the applicable revenue act losses from sales of stock are deductible even if repurchased, except where it appears that within thirty days before or after the date of such sale the taxpayer has acquired or has entered into a contract or option to acquire the same stock. Sec. 118, Revenue Act of 1928. The evidence discloses that the petitioner did not repurchase the stock within thirty days after its sale to his wife or, at any time previous to the repurchase more than two years later, agree to repurchase it.

That a loss sustained upon the sale of shares of stock constitutes a statutory deduction in the years involved in this proceeding can not be questioned even though the sale was made by a husband to his wife. *Carl P. Dennett, supra; Joseph E. Uihlein, supra;* and *Commissioner* v. *Hale, supra.* No question has been raised here about the right of a husband to make sales to his wife or vice versa, under the laws of New York. This deductibility is further shown by the fact that Congress for the first time in the Revenue Act of 1934 provided that in computing net income no deduction shall be allowed in respect to a loss from sales or exchanges of property, directly or indirectly, between members of a family, which include brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants. Sec. 24 (6) (A), (D), Revenue Act of 1934.

The purpose of the enactment of this provision is stated in Report No. 558 of the Committee on Finance, 73d Cong., 2d sess., p. 27, as follows:

Experience shows that the practice of creating losses through transactions between members of a family and close corporations has been frequently utilized for *avoiding* the income tax. It is believed·that this provision will operate to close this loophole of tax avoidance. [Emphasis supplied.]

This language discloses that sales between members of the same family had theretofore been regarded as valid to create deductible losses under the revenue acts and as made in tax avoidance, rather than in tax evasion or fraud. Since Congress had, under revenue acts prior to the Revenue Act of 1934, including those applicable

here, permitted the deduction of losses resulting from the sale of stock without limitation as to the relationship of the seller and purchaser, except as to sales involving a repurchase within the thirty days, it was within the power of Congress, and that of Congress alone, to prohibit deductions of losses on sales made between husband and wife.

Since there was no fraud committed in the sale of the stock on December 20, 1929, it follows that there was no fraud committed by petitioner in 1930 because of his failure to report as income the dividends paid on the 18,300 shares of National City Bank stock, the stock being the property of the petitioner's wife, and she, and not he, being entitled to the dividends thereon.

### V.

I agree with the concurring opinion of Members Black, Trammell. Arundell, and Leech that the evidence does not establish fraud as to the item of $666,666.67 received by the petitioner as a distribution from the management fund in July 1929. In this view, the statute of limitations has run and hence it is unnecessary to pass upon the issue as to whether it was income to petitioner in 1929, as was concluded by them. Legal counsel, including a former (then recent) Under Secretary of the Treasury of the United States, relied on I. T. 2043, III–2, C. B. 94, in advising the National City Co. and the petitioner that this and other items of the same character were not deductible by it as expense in 1929 or includable in income for 1929 by him or other recipients of such items, on the ground, in effect, that this and other such items were overdrafts and hence debts due to the National City Co. from the recipients by the close of 1929, under all the facts and circumstances. Cf. *William H. Stayton, Jr.*, 32 B. T. A. 940.

Their concurring opinion well illustrates the rule that acts may be unlawful but free from fraud, and the heavy burden that rests upon the respondent to prove fraud by clear and convincing evidence, which is more than a preponderance of evidence, even where such acts are unlawful. *James Nicholson, supra.*

Even if it be assumed that this item was income to the petitioner and an expense to the National City Co., there is no evidence in the record which justifies a finding or holding that petitioner, in failing to include this item in his taxable income for 1929, committed fraud. The following by a client of a mistaken opinion of competent lawyers does not constitute fraud. The best of lawyers make mistakes of this character.

A taxpayer is not required to disregard the advice of legal counsel at the peril of imprisonment or severe penalties for following it. Counsel here, after full investigation of the law and an exchange of

1154

views, concurred in the advice to the National City Co. and the petitioner to the effect that this item of $666,666.67 was not deductible by the former as an expense or includable in income by the latter; and it was not deducted by the former. Both had specialized in the field of Federal income taxation. It was conceded by counsel for the respondent at the hearing that the board of directors of the National City Co., of which this former Under Secretary of the Treasury was one, while not a recipient of any of the management fund, "were distinguished bankers and well-known in the community" and "men of large affairs in the business world." In at least two instances recipients of moneys from the management fund in 1929 who were in a position to do so have since made payment. The payment of the $140,438.98 is fully explained in the proof wholly in keeping with freedom from fraud on the part of petitioner as to the $666,666.67.

VI.

The proceedings of this Board are conducted in accordance with the rules of evidence applicable in courts of equity of the District of Columbia. Sec. 907 (a), Revenue Act of 1924, as amended by sec. 601, Revenue Act of 1928.

In *Brown* v. *Peterson*, 25 App. D. C. 359, the Court of Appeals for the District of Columbia stated:

* * * The law is that positive testimony uncontradicted and not inherently improbable, is prima facie evidence of the fact which it seeks to establish, and the jury is not at liberty to disregard it. *Crane* v. *Morris*, 6 Pet. 598, 8 L. Ed. 514; *Kelly* v. *Jackson*, 6 Pet. 622, L. Ed. 523; *Quock Ting* v. *United States*, 140 U. S. 417, 35 L. Ed. 501, 11 Sup. Ct. Rep. 733, 851; *The City of New York* (*Alexandre* v. *Machan*) 147 U. S. 72, 31 L. Ed. 84, 13 Sup. Ct. Rep. 211.

To the same effect is *Walker* v. *Warner*, 31 App. D. C. 76.

In *Epremiam* v. *Ward*, 169 Fed. 691, it was stated:

The court is bound to give credence to uncontradicted testimony even from interested persons when it is substantiated as it was here, and is not inconsistent with well-known facts, experience, and reason.

In *Blackmer* v. *Commissioner*, 70 Fed. (2d) 255 (C. C. A., 2d Cir ), the court said:

* * * *When the evidence before the Board, as the trier of the facts, ought to be convincing, it may not say that it is not. Sioux City Stockyard Co.* v. *Commr.*, 59 Fed. 2, 944 (C. C. A. 8) ; *Conrad & Co.* v. *Commr.*, 50 Fed. 2, 576 (C. C. A. 1) ; *Chicago Ry. Equipment Co.* v. *Blair*, 20 Fed. 2 10 (C. C. A. 7). *And the Board may not arbitrarily discredit the testimony of an unimpeached taxpayer so far as he testifies to facts.* [Emphasis supplied.]

To the same general effect as the foregoing cases are *Tracy* v. *Commissioner*, *supra* (C. C. A., 6th Cir.); *Planters Operating Co.* v. *Commissioner*, 55 Fed. (2d) 583 (C. C. A., 8th Cir.); *Citrus Soap Co. of California* v. *Lucas*, 42 Fed. (2d) 372 (C. C. A., 9th Cir.).

See discussion at page 472 of the opinion in *Jewett & Co.* v. *Commissioner*, 61 Fed. (2d) 471 (C. C. A., 2d Cir.).

The burden of proof is not discharged by presenting facts which are susceptible of conflicting inferences. *Pennsylvania R. R. Co.* v. *Chamberlain*, 288 U. S. 333; *U. S. F. & G. Co.* v. *Des Moines National Bank*, 145 Fed. 273; and *Dickeron* v. *United States*, 18 Fed. (2d) 887.

Upon the foregoing authorities, and the authority of the *Kerbaugh* case, which requires that fraud shall be proven not only by a preponderance of the evidence but by clear and convincing evidence, the proof in this proceeding requires that petitioner be here exonerated of all of the charges of fraud, as the District Court and jury exonerated him of the same charges, and as the majority has exonerated him of one of those same charges, and all on substantially the same evidence, including his own. If his testimony is credible on one issue of fraud it should not be disregarded as to the others, in view of the whole record. The proof fully and satisfactorily explains everything that occurred in so far as explanation is essential to correct decision here, all wholly consistent with freedom from fraud on petitioner's part. There is no inherent or other improbability in the statements of petitioner or his witnesses and there is nothing in the record to discredit their testimony. They readily produced all the proof they had. The record does not indicate any concealment of any proof before or at the hearing. The respondent has not impeached or rebutted the vital, controlling, determinative full evidence produced by petitioner. Such evidence remains undisputed. The testimony of petitioner and his witnesses is corroborated by writings and voluminous exhibits, and by numerous written and oral stipulations. The testimony of petitioner, his wife and his other witnesses is comprehensive, clear, and consistent throughout. Their testimony is unequivocal and exhibits intelligence and earnestness. There is nothing in the record to show that any of them committed perjury. No adequate reason is given by the majority for discrediting any part of their vital testimony. On the contrary, nearly all of the findings of the majority are founded upon it, the writings produced by them and the stipulations; and the opinion of the majority indicates that at least some of the testimony of the petitioner may have been considered plausible on the issues in respect to which fraud is here found.

If the theory of the respondent as to the facts in this proceeding is correct, then petitioner's wife and other credible witnesses, his friends and associates, were guilty of some elements of fraud, and petitioner deliberately involved her and them in the committing of fraud. Upon the whole record this is incredible.

There is much that is commendable of petitioner in the record as heretofore revealed herein and by the majority. He was in 1929 a member of the board of directors, and of the executive com-

mittee thereof, of the Federal Reserve Bank of New York. He not only had the confidence of the community in which he lived to an unusual degree, but he was highly regarded elsewhere. He dauntlessly stepped into and, to the extent possible, saved a critical situation on October 29, 1929, against the advice of a friend and associate. That was the beginning of his reverses financially. He did this to support the market for the stock of his bank, the outstanding shares of which totaled 5,000,000, of which he owned but 35,000, after the National City Co., owned by all the stockholders of the bank, had exhausted its capacity to do more in this respect. If he had not done this there might have been a dumping of the stock of the bank coupled with a run on the deposits; and the bank might have been wrecked. He stayed with it all down to the end of the record in this proceeding. Notwithstanding that his large fortune was gone and he was insolvent by $3,000,000, he was not dismayed and he remained true to his creditors and all those who put confidence in his integrity. There is no evidence that he was even asking any consideration from his creditors. A man of that type is not apt to commit fraud, as charged here; and upon the whole record, and the applicable law, he should not be penalized for fraud as found and held by the majority. Too, the fact that he repurchased the stock from his wife is commendable. He had represented the stock to her for a good investment. It proved disastrous to her. He saved her practically whole and thereby relieved her of anxiety and embarrassment as he should have done. There is no correct test that requires that a husband do differently, notwithstanding the rule that requires close scrutiny of their transactions in question here. The fact that he became insolvent should not be permitted to militate against his repurchase. A man that could make $30,000,000 as he did can retrieve himself. It is common knowledge that this sort of thing has been done often.

The findings of the majority quote from the testimony a portion of what was testified to upon the subject of what was said at the annual meeting of the stockholders of the National City Bank early in 1930 touching upon the subject of the sale of his bank stock. Petitioner does not deny that he made such a statement and it appears that he was then talking about his permanent investments of his own money in such stock, of which he then had 35,000 shares, which he did not sell. The incident is fully and satisfactorily explained by undisputed proof. It is obvious that he parried the question in so far as it touched the 28,300 shares which he had bought temporarily to protect the bank and the National City Co. If he had stated that he had recently bought and sold 28,300 shares to that comparatively large and somewhat panicky meeting of stock-

holders, it might have proved disastrous. Other evidence could have been set forth in the findings which would, with justification, account for what was said. He had told directors and others about the purchase and sales of the 28,300 shares. Early in 1931 he told his personal counsel about the sale to his wife when he gave him information for the basis of his last will and testament.

Other evidence favorable to the petitioner on all other subjects could be fully pointed out and quoted in support of all of the conclusions here reached.

For the numerous reasons hereinbefore set forth, I respectfully dissent from the findings and holdings of the majority to the effect that the petitioner has been proven guilty of fraud by clear and convincing evidence.

All of the conclusions herein set forth are based on the undisputed proof in the record.

In view of the conclusions herein reached, it is unnecessary to further consider any of the other phases of the questions presented by the parties or suggested by the record, except to state that I agree with the majority that the filing of petitioner's reply was properly allowed.

SMITH, dissenting: I am of opinion that the acquittal by a jury of the petitioner of the charge of fraud in filing income tax returns for the tax years here in question is a complete bar to a finding by this Board of fraud in the filing of those returns. *Coffey* v. *United States*, 116 U. S. 436.