Chase H. Lord v. Commissioner.
Lord v. Commissioner
Docket No. 108889.
United States Tax Court
1943 Tax Ct. Memo LEXIS 93; 2 T.C.M. (CCH) 875; T.C.M. (RIA) 43442; October 1, 1943
*93 1. Petitioner's taxable net income for the years 1933 to 1937, inclusive, determined from the evidence. 2. Upon the evidence, held, no part of any deficiency for the years involved is due to fraud with intent to evade tax. 3. Petitioner had taxable net income for each of the years involved but failed to file a return for any of the taxable years. Held, the penalty provided in section 291 of the Revenue Acts of 1932, 1934 and 1936 for failure to file a return is mandatory. Douglas L. Edmonds, Administrator, 31 B.T.A. 962, followed. William C. Allee, Esq., and Godfrey Hammel, C.P.A., 1248 Free Press Bldg., Detroit, Mich., for the petitioner. Paul A. Sebastian, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding involves the determination by the respondent of deficiencies in income tax, fraud penalties, and delinquency penalties against petitioner for the taxable years 1933 to 1937, inclusive, in amounts as follows: 25%
50% Fraud
Delinquency
Year
Deficiency
Penalty
Penalty
1933
$ 7,640.83
$ 3,820.42
$1,910.21
1934
9,470.87
4,735.44
2,367.72
1935
21,926.35
10,963.18
5,481.59
1936
21,450.50
10,725.25
5,362.63
1937
396.76
198.38
99.19
*94 In a statement attached to the deficiency notice the respondent advised petitioner as follows: Information on file in this office discloses that during the years 1933 to 1937, inclusive, you received certain funds directly from three socalled Founders Trusts and/or that you benefited from certain amounts charged to your account on the books of said trusts in the amounts indicated below: Year
Amount
1933
$46,761.48
1934
51,941.51
1935
83,076.23
1936
80,355.88
1937
9,787.90
Since you failed to file any income tax returns for the years 1933 to 1937 inclusive, there has been added to the tax 25% thereof in accordance with Section 291 of the Revenue Act of 1936, and corresponding provisions of the Revenue Acts of 1932 and 1934. There has also been added to the tax the 50% fraud penalty, as provided in Section 293 (b) of the Revenue Act of 1936 and corresponding provisions of the Revenue Acts of 1932 and 1934. By appropriate assignments of error petitioner contests the action of the respondent in determining that the above-mentioned amounts represented income to petitioner in the years 1933 to 1937, inclusive. The respondent affirmatively alleges that the deficiencies *95 determined by him "are due to fraud with the intention of evading Federal income taxes." Findings of Fact Petitioner is a citizen of the United States and resides in Windsor, Ontario, Canada. At the time of the hearing he was approximately 70 years of age, married and living with his wife. He has made his home in Windsor since June, 1932. He filed no Federal income tax returns for any of the taxable years here involved. In 1932, petitioner conceived the idea of extracting gold from placer deposits by combining into one machine the Wrentmore jet and the Ainlay concentrator or bowl. He had several conferences in Colorado with a Mr. Hamilton and others including the Superintendent of the Denver mint. These conferences ended in an informal understanding whereby petitioner would be permitted to use certain principles of the concentrator together with those of his own. Petitioner told Hamilton that he would be willing to pay for the principles he used at the rate of $75,000 for sufficient concentrators to produce $6,000 worth of gold a day net, but that on the first unit that was developed and finished petitioner wanted the right to borrow the money that would be payable to Hamilton *96 on account of the rights thus secured to use the principles of the Ainlay concentrator or bowl. Hamilton and the others thought that such a deal would be quite satisfactory and suggested drawing a contract but petitioner thought that should be done later after the combined principles were developed and proven to do satisfactory work. This informal understanding was never reduced to writing but Hamilton and petitioner agreed upon it and called it a deal. Petitioner later went to Detroit and there met Carl Wrentmore and arranged with him to use the Wrentmore jet. On April 18, 1933, petitioner created a trust known as "Founders Trust" hereinafter sometimes referred to as the 1933 trust. The 1933 trust was created by petitioner for the purpose of raising money to finance the developing of machinery suitable for mining gold and placing such machinery in operation on leased mining properties at Stanley Basin, Idaho. Petitioner was the grantor of the trust and as such named Charles J. Weger of Cleveland, Ohio, and Cyrenius A. Newcomb, III, of Detroit, Michigan, as trustees to manage the trust. The trust indenture recited that petitioner was authorized to use a certain concentrator covered *97 by United States Patent 1658874, referred to as the Ainlay bowl; that he was the inventor of screening boulders from gravel in connection with a suction pipe and/or syphon pump; and that he was authorized to use a certain syphon pump invented by Wrentmore, such machinery and equipment being applicable to the extraction of gold from placer lands. By the trust instrument petitioner gave and granted unto the trustees "in trust, however, the following rights, privileges and concessions, and subject to the conditions, limitations and uses hereinafter set forth: 1. The right to purchase and own as Trustee [certain designated combinations of machines and camp equipment known as "units" costing from $75,000 to $304,000 and capable of producing from 300 to 1,500 yards per hour.] 2. The right to work or have worked with the above equipment placer deposits wherever located, at no cost to said Trustees, except the royalties to be paid by said Chase H. Lord and/or his associates to the owners of said lands under and in accordance with the leases of the said Chase H. Lord of said placer deposits, and also except royalties payable on the equipment used in the operation. 3. To contract with the *98 said Chase H. Lord and/or his associates for the operation of said unit when completed and placed on the property ready for operation by the said Chase H. Lord and/or his associates at the actual cost of such operation. * * * * *
5. The said Chase H. Lord and/or his associates to be given the exclusive rights of operation of the said unit upon the terms and conditions above set forth, and all of the Class "B" participating units of interest for such rights and privileges. The 1933 trust further provided that the funds necessary to develop the equipment and place it in operation at the mine should be raised by selling debentures in an amount not to exceed $150,000 payable in five years with interest at the rate of 7 percent per annum. Each purchaser of $1 of debentures was entitled to have issued to him without extra charge one class A participation unit. The participation units were divided into two classes, class A and class B. The class B units were to be issued to petitioner, one unit to be issued for each $1 of debentures sold. The proceeds of the operation of the mine were to be used, first, to cover necessary costs of operation and expenses chargeable to the trustees and *99 compensation for the trustees. One-half of any remaining balance was to be applied, first, to the payment of interest on all outstanding debentures and, second, for the redemption of the debentures pro rata. The remaining one-half was to be divided into two equal parts, one part to be distributed to the holders of the class A participating unit certificates, share and share alike; the other equal part to be similarly distributed to the holders of class B participating unit certificates. On October 18, 1934, petitioner created another trust known as "Founders Trusts" sometimes referred to herein as the 1934 trust. This trust was substantially the same as the 1933 trust except for an increase in the authorized debentures and the issuance of only one class of participating units. It had the same trustees as the 1933 trust. It authorized debentures up to the principal amount of $300,000 and an aggregate of 600,000 participating units. The trustees were granted the right to exchange at par the debentures and participating units therein authorized respectively for debentures and participating units of the 1933 trust, and in addition, to credit each of the debenture holders of the 1933 *100 trust with an amount equal to the accrued and unpaid interest on the debentures received from each of them respectively by the trustees in such exchange to the date of exchange. Paragraphs 2 and 3 of the 1934 trust provided: (2) Payment for the right to have constructed and own as Trustees equipment with sufficient daily capacity to produce concentrates containing one hundred fifty (150) troy ounces of refined gold and for six (6) thirty-six (36) inch concentrator bowls with base plates to be furnished by the Grantor hereunder, shall be thirty-seven thousand five hundred ($37,500.00) dollars; like payment shall be made for each added one hundred fifty (150) troy ounces daily capacity with the six (6) additional bowls and base plates furnished by the Grantor therefor. Any additional concentrator bowls which may at any time be needed to produce the granted capacity may be added at Trust expense. (3) To contract with the said Grantor and/or his associates for the operation of the said Units when completed and placed on the property ready for operation at the actual cost of operations including the royalties to be paid to the lessors of said lands, and also any royalties payable on the *101 equipment used in the operation including superintendence on the property but excluding executive overhead and interest charges; The Grantor to be given the exclusive rights of operation of the said Units upon the terms and conditions above set forth so long as the said operations by the Grantor and/or his associates are conducted in good and minerlike manner. On December 22, 1936, petitioner created another trust also known as "Founders Trusts" and sometimes referred to herein as the 1936 trust. This trust was substantially the same as the two previous trusts except that John H. Barrett of Windsor, Ontario, was substituted in place of Weger as one of the two trustees, and except for an authorization by the new trust of debentures up to the principal amount of $500,000 and an aggregate of 1,000,000 participating units. The trustees were granted the right to exchange at par the debentures and participating units therein authorized respectively for debentures and participating units of the two previous trusts, and in addition, to credit each of the debenture holders of the earlier trusts with an amount equal to the accruing and unpaid interest on the debentures received from each of *102 them respectively by the trustees in such exchange to the date of the exchange. Paragraph 3 of the 1936 trust was identical with the above paragraph 3 of the 1934 trust. Paragraph 2 of the 1936 trust was as follows: (2) Payment for the right to have constructed and own as Trustees equipment with sufficient daily capacity to produce concentrates containing Two hundred fifty (250) troy ounces of refined gold and for sufficient concentrators to be furnished by the Grantor hereunder, shall be sixty-two thousand five hundred ($62,500) dollars; similar payment shall be made for added daily capacity with the additional concentrators furnished by the Grantor therefor. Each of the three trusts contained a provision that the trust was to continue for 30 years or until such time as the trustees should determine that a further continuation of the trust was inadvisable for any cause or unprofitable. On January 2, 1937, the trustees of the 1934 trust sold, assigned and transferred to the 1936 trust all the assets of the 1934 trust. In 1933, petitioner went to Idaho and leased a placer deposit in his own name and then transferred the lease to the 1933 trust at no profit or loss to petitioner. *103 In 1933, the 1933 trust under petitioner started to build a camp and roads in Idaho preparatory to working the leased placer lands. Petitioner worked on the Founders Trusts' project from 1933 until 1937 except for a period in 1935 when he was ill and confined to his bed or wheel chair with arthritis. During the time petitioner worked on this project from 1933 to 1936, inclusive, he was paid no salary as such, nor did he receive any dividends or commissions from any of the trusts. He sold nothing to the trusts at a profit. He did receive one participation unit for each $1 of debentures that were sold. So far as the record shows these participation units had no fair market value and could not be sold. On March 2, 1937, petitioner as second party entered into an agreement with the trustees of the 1936 trust in regard to obtaining the services of petitioner in the further development of the project. Paragraph one of this agreement was first drawn up in typewritten form as follows: 1. Parties of the first part agree to and do hereby retain party of the second part as the Chief Engineer in charge of mining and dredging operations in the development of the project and/or projects created *104 by the above mentioned Indenture of Trust and agree to pay said Party of the Second Part as a drawing account during the period of such development the sum of not to exceed dollars per month. The mining and dredging operations herein referred to shall be done in an economical and workmanlike manner. Before petitioner would sign the agreement he insisted on having a line drawn through the words "drawing account during the period of such development the sum" and on having inserted in place thereof the words "repayment of the various sums heretofore advanced by him the sum" and on having inserted in the blank space the words "One thousand dollars" and the figures $1,000.00". The 1936 trust maintained an account captioned "C. H. Lord Drawing Account. 1000 per mo. as per contract dated March 2. 1937" to which account there was entered the following debits: Date
Items
Folio
Debits
1937
Mar. 31
4
$1,215
April 30
6
750
May 31
7
600
May 31
Payment for all drawing
and engineering acts to June 2,
1937
9
1,185
June 30
10
1,200
July 31
C-13
1,300
Aug. 31
14
500
Total debits
$6,750
No dividends were paid to petitioner on the participation *105 units issued to him as the trusts' project was unsuccessful. No more than about $300 worth of gold was ever recovered. During the period under consideration petitioner borrowed $12,000 from Henry Betterman and $10,000 from Francis Shriner. He spent this money partly in building the test machine, partly in buying trucks and transportation equipment and partly for traveling expenses. No detailed segregation of how this money was spent was proved by the evidence. Neither petitioner nor his wife had substantial funds. With the exception of two short trips petitioner's wife always accompanied him as his secretary but she did not receive any compensation from any of the trusts therefor. During the taxable years here involved petitioner rented a house in Windsor and paid from $100 to $150 a month rent therefor. This house was used for the dual purpose of a residence and as a place to exhibit the concentrator while petitioner was in Idaho. During the last year and a half prior to the hearing of this proceeding, November 4, 1942, petitioner has been buying this house on contract. connection with his home in Windsor, Canada, such as rent, light, heat, telephone, gardner, etc., automobile *106 for his personal. use, personal medical expenses, etc. The petitioner also supported his wife's mother. Mrs. Fannie Pincus, for a period of several years from funds received from Founders Trusts. The aggregate of these personal and living expenses of petitioner, his wife and his mother-in-law paid by him out of funds charged to the Rights account was $6,000 in each taxable year 1933, 1934, 1935 and 1936. The same character of personal expenses as that named above was paid in 1937 out of the $6,750 which petitioner drew out of his drawing account and all of which represented taxable income to him. Other than the personal expenses named above the petitioner expended the balance of the $219,794.11 named in the first eleven items charged to the Rights account, in and about the projects of the trust, including machinery, camp equipment, etc. Petitioner ceased to be active in the affairs of the trusts in the early part of 1937 when Barrett went west. At that time petitioner was heavily in debt. He owed Batterman approximately $56,000; Shriner $10,000; and a Dr. Campbell about $50,000. The only property he owned was some personal property and furniture and the participation units of the *107 trusts. Petitioner's taxable net income for the years 1933 to 1937, inclusive, was as follows: 1933
$8,050.00
1934
6,000.00
1935
6,000.00
1936
7,000.00
1937
7,250.00
No part of any deficiency for the years 1933 to 1937, inclusive, is due to fraud with intent to evade tax. Opinion BLACK, Judge: We shall first consider whether petitioner had any taxable income for the years in question for if he had no income it would not be necessary to consider the questions of penalties. The respondent determined that petitioner had a substantial net income for each of the taxable years. This determination is prima facie correct and the burden is on the petitioner to show otherwise. The assignments of error included in the petition read as follows: (4) The Commissioner errs when he contends that certain funds received by and/or credited to this Petitioner from the "Founders Trusts - 1. 2 & 3" or funds expended directly by the "Founders Trusts" and charged to this Petitioner's account, was income to him in these various years. (5) The Commissioner errs when he contends that this Petitioner personally benefited from these funds in such a manner that they could be classified *108 as income to this Petitioner. We are satisfied from all of the evidence that petitioner did not have anywhere near the net income which the respondent has attributed to him. Petitioner contends that he did not have any taxable net income at all, but we do not think the evidence sustains that contention. It seems clear to us that during the years 1933, 1934, 1935 and 1936 certain personal expenses were paid by petitioner from funds paid to him by the trust and charged to the so-called Rights account, in the manner described in our findings of fact. For 1937 these personal living expenses were paid out of the $6,750 which petitioner drew from his "drawing account" with the trust and, for reasons hereinafter stated, we hold that all of this $6,750 represented taxable income to petitioner in 1937. The record shows that during the taxable years in question petitioner's chief interest was to make a success of the gold mining project. With the exception of the time that he was ill in 1935 he devoted all of his energies in that direction. With the exception of the drawing and engineering accounts which we shall discuss later in this opinion, he received no remuneration, except the sums *109 which he used in the taxable years to defray his personal living expenses as set out in more detail hereafter. His hope of profit rested in the success of the mining enterprise in which event he was to receive royalties from the use of certain machines perfected by him and dividends from the participation units of the trusts. The enterprise was not successful and he received no income from either royalties or dividends. The enterprise was financed by means of selling debentures. The debentures were payable in five years with interest at the rate of 7 percent per annum. For each dollar of debentures sold, the debenture holder was given one participation unit in the trust and petitioner was given one participation unit. Over $400,000 of debentures were sold and over 800,000 of participation units were issued. Whether these participation units had any fair market value the record does not show. It may be safely assumed, we think, on account of the highly speculative character of the whole venture, that these participation units did not have any fair market value. In any event the respondent has not determined that petitioner received any income due to the receipt of the participation *110 units and so we need not further consider that possibility. Practically all of the money received from the sale of debentures was expended either directly by the trustees or through petitioner. The total expenditures are listed in our findings. Of these total expenditures, $222,933.34 was charged to the Rights account. In all there were 14 items charged to the Rights account. These 14 items are also listed in our findings and total $295.207.34. The above amount of $222,933.34 consists of all of the items except Item 13. We shall discuss Item 13 later in this opinion. The items making up the amount of $222,933.34 may be summarized from the list in our findings as follows: Not
Charged
Determined
deter-
to
as
mined as
Item
rights
taxable
taxable
No.
account
income
income
1 to 11, inc
$219,794.11
$193,949.00
$25,845.11
12
3,050.00
3,050.00
14
89.23
89.23
$222,933.34
$196,999.00
$25,934.34
Of the sums charged to the Rights account we have found in our findings of fact that petitioner used funds to defray his personal living expenses for himself and wife, expenses in connection with his home in Windsor, Canada, such as rent, light, heat, *111 telephone, etc., automobile for his personal use, personal medical expenses while he was sick, support of his wife's mother, Mrs. Fannie Pincus, during the taxable years in question. The total of these amounts was $6,000 in each of the taxable years 1933, 1934, 1935, and 1936. Our findings in this respect are based upon all the evidence in the case and are the best approximation we can make under the circumstances. Petitioner conceded in his testimony at the hearing that he spent some of the money charged to the Rights account for his personal living expenses, including the support of his mother-in-law, house rent in Windsor, Canada, etc. Petitioner contends, however, that the sums which he spent for his personal living expenses during the years in question represent a debt which he owes to the trust and therefore do not represent taxable income to him. We are not strongly impressed with this contention and, therefore, do not sustain it. Petitioner also contends that the amounts which he spent for his personal living expenses in each of the years in question were very materially less than the amounts which we have fixed in our findings of fact. Petitioner, however, kept no record *112 of these matters and if there is any error in our findings in this respect the inexactitude is of petitioner's own making. Cf. Cohan v. Commissioner, 39 Fed. (2d) 540. We hold that these amounts should be regarded as compensation paid petitioner for services rendered and to that extent the respendent's determination in connection with Items 1 to 11, inclusive, which were charged to Rights account is sustained. We also sustain the respondent's determination in connection with Item 12, which was cash paid to petitioner, $2,050 in 1933 and $1,000 in 1936. These items were not satisfactorily explained by petitioner and as to them the Commissioner's determination is approved. Item 13 was a charge to the Rights account of Founders Trusts Debentures in the amount of $72,274. Of this amount the respondent included $67,674 in petitioner's taxable net income. The trustees did not consider this charge as either cash received or cash expended. The $4,600 not included in taxable net income by the respondent represented a credit to the Rights account of that amount by the trustees. Petitioner did not receive any of these debentures either directly or indirectly. *113 They were issued either to persons who performed some service in one way or another for one of the trusts or represented debentures sold by Weger and the cash used for some trust activity. We hold that no part of the debentures, in the amount of $67,674 should be regarded as taxable net income to petitioner. This leaves for discussion the drawing and engineering accounts in the amounts of $6,750 and $500, respectively, in 1937. No evidence was offered as to the nature of the engineering account, so as to that item we sustain the respondent's determination. Relative to the so-called drawing account in the amount of $6,750, petitioner contends that in accordance with the March 2, 1937 agreement referred to in our findings, these payments to him should be regarded as the "repayment of the various sums heretofore advanced by him." We Newcomb, one of the above-mentioned trustees, kept the books of the several trusts until sometime in 1936. Newcomb and his family made investments in the several trusts of between $125,000 and $150,000. They were the largest investors in the enterprise. The deficiencies here involved result from the respondent's determination that certain amounts charged *114 on the books of the several trusts to an account, hereinafter sometimes referred to as the "Rights" account, represented taxable net income to the petitioner. This account was first opened up under the caption of "Concentrator". Later it was changed to "Lord Rights" and then to "Advanced on Rights". The amounts charged to the Rights account represented money which was advanced, either in currency or by check, to petitioner to handle phases of the project, which were at first glance, not positively chargeable to one of the trusts, within a strict interpretation of the respective trust indenture. It was the intention of the petitioner and the trustees at the time these charges were made to the Rights account that the amounts so charged would be analyzed later for the purpose of determining how much thereof should eventually be charged as a trust expenditure. Petitioner indicated that he would bear any expense that was finally decided not to be chargeable back to the trust. The trustees also placed in the Rights account moneys which were turned over to other persons to handle certain miscellaneous activities for which petitioner indicated he would be responsible. These included the *115 shopping trips necessary to procure various camp equipment and small machinery items. The Rights accounts was also charged with commissions paid and expenses incurred in the selling of the debentures. There were a number of people who performed work for petitioner in connection with the construction activities who were willing to take some of their remuneration in debentures and the debentures issued in this manner were charged to the Rights account. In some instances Weger collected money from the sale of debentures and turned this money over to petition for some immediate purchase next in line, but since Newcomb had not actually seen the cash for these debentures, he also charged the Rights account with those items, intending later to credit the Rights account with any amounts that would be determined later to be a trust cost. The Rights account was in substance a suspense or adjustment account against which items were charged awaiting future classification or allocation. There were some credits made to the account and it was contemplated that much more extensive charge-backs would be made eventually, but no complete accounting was ever made of the account. The records from which *116 an accounting could have been made were lost in the fall of 1936. During the period from 1933 to 1937, inclusive, there was charged to the Rights account a total amount of $295,207.34. The respondent determined that $264,673 of the amount so charged to the Rights account was taxable income to the petitioner to which the respondent added the above-mentioned drawing account of $6,750 and an unexplained engineering account of $6,750 and an unexplained engineering account of $500, or a total determined taxable income of $271,923. The taxable income determined by the respondent for each year was as follows: 1933
$ 46,761.48
1934
51,941.51
1935
83,076.23
1936
80,355.88
1937
9,787.90
Total
$271,923.00
The items charged to the Rights account, the amounts thereof determined by the respondent to represent taxable income, and the amounts determined by the respondent not to represent taxable income, were as follows: Not
Charged to
Determined
determined
Item
Rights
as taxable
as taxable
No.
Item
account
income
income
1
Moneys wired to petitioner
$ 69,515.41
$ 69,515.41
2
Checks transmitted to petitioner and endorsed by peti-
tioner
57,775.00
57,775.00
3
Checks in favor of petitioner and endorsed by New-
comb
9,825.00
9,825.00
4
Checks in favor of petitioner and endorsed by Arthur
Driver
1,300.00
$ 1,300.00
5
Checks in favor of petitioner and endorsed by various
persons
$ 18,527.38
$ 11,136.00
$ 7,391.38
6
Checks issued to Weger
5,615.00
5,615.00
7
Checks issued to various persons
13,523.17
9,551.11
3,972.06
8
Checks issued to Arthur Driver
7,888.51
7,888.51
9
Funds wired to Porter Martin
2,225.00
2,225.00
10
Funds wired to various persons
3,068.16
3,068.16
11
Checks issued to order of Newcomb
30,531.48
30,531.48
12
Cash to petitioner
3,050.00
3,050.00
13
Founders Trusts Debentures
72,274.00
67,674.00
4,600.00
14
Wire charges
89.23
89.23
Totals
$295,207.34
$264,673.00
$30,534.34
Add: 15
Drawing account
6,750.00
16
Engineering account
500.00
Total taxable income determined by the respondent
$271,923.00
*117 The portions of the above-mentioned items charged to the Rights account which the respondent determined were taxable income were determined by the respondent to represent taxable income in separate taxable years, as follows: Item
No.
1933
1934
1935
1936
1937
Total
1
$ 2,266.63
$ 525.40
$16,673.38
$50,050.00
$ 69,515.41
2
20,690.00
13,010.00
17,250.00
5,125.00
$1,700.00
57,775.00
3
3,500.00
4,875.00
1,450.00
9,825.00
5
950.00
3,226.00
6,960.00
11,136.00
6
800.00
2,100.00
2,715.00
5,615.00
7
1,304.85
833.00
3,191.00
3,854.36
367.90
9,551.11
11
4,800.00
5,072.11
11,642.85
9,016.52
30,531.48
12
2,050.00
1,000.00
3,050.00
13
11,200.00
23,600.00
23,809.00
8,595.00
470.00
67,674.00
15
6,750.00
6,750.00
16
500.00
500.00
$46,761.48
$51,941.51
$83,076.23
$80,355.88
$9,787.90
$271,923.00
The above-mentioned credits that were made to the Rights account by the trustees amounted to $32,560.67, which was $2,026.33 more than the above amount of $30,534.34 which the respondent determined did not represent taxable income. During the period from 1933 to 1937, inclusive, the trusts received *118 cash, principally from the sale of debentures of $417,052.07. During this same period the trusts expended cash in amounts as follows: Leasehold properties
$ 15,200.00
Machinery, equipment, and camp fa-
cilities
84,812.47
Transportation, improvement, and in-
stallation
18,346.64
Furniture & Fixtures
474.20
Stanley dredge account
4,500.00
Stanley dredge account - Barret
26,795.00
General expense
25,928.67
Drawing account - Chase H. Lord
6,750.00
Drawing account - Others
5,500.00
Engineering account - Chase H. Lord
500.00
Engineering account - Others
$ 760.00
Lord accounts paid
4,370.46
Wire charges (exclusive of Rights
account)
169.68
Charged to Rights account
222,933.34
Total expenditures of trusts
$417,040.46
The above-mentioned amount of $72,274 Founders Trusts Debentures charged to the Rights account was not treated by the trustees as either cash received or cash expended. Petitioner did not receive any part of these debentures either directly or indirectly. No part of these debentures represented taxable income to petitioner. The total of the first eleven items charged to the Rights account is the amount of $219,794.11. Petitioner used some of these funds *119 composing the total of $219,794.11 for personal purposes such as personal living expenses for himself and wife, expenses in are not impressed with that contention. We think the agreement of March 2, 1937, was essentially a contract of employment and that the $6,750 paid to petitioner in that year should be regarded as taxable income in his hands. We, therefore, sustain the respondent's determination as to this item. For the year 1937 respondent also included three items, namely, $1,700, $470 and $367.90, charged to the Rights account. We think the evidence sustains petitioner's contention that the expenditures represented by these items were made for the general purposes of the trust as already detailed by us and did not represent income to petitioner. The amounts of petitioner's income in each of the taxable years has been set out in our findings of fact in accordance with our discussion above. Was any part of the deficiencies as herein revised by our holdings above due to fraud with intent to evade tax? Section 293(b) of the Revenue Act of 1932 is identical with the same section in the Revenue Acts of 1934 and 1936, and is in the margin. [1] "Fraud is a fact to be proven by clear *120 and convincing evidence." Charles E. Mitchell, 32 B.T.A. 1093, 1128. Congress in section 601 of the Revenue Act of 1928 has placed the burden of proof in respect of fraud upon the respondent.
Respondent has proved that petitioner during the taxable years in question handled large sums of money in a very loose and unbusinesslike manner, and has never made any accounting for same. In fact one might well wonder that investors would put such large sums of money, as disclosed by the evidence in this case, in an enterprise so highly speculative in character and so loosely managed as this one. But, nevertheless, it was done and it was proved that the project was no fiction of the imagination. It was proved that large sums were spent in Idaho extending over a period of several years in endeavoring to get this gold mining venture *121 established. Land was leased, roads were constructed, machinery was assembled, and a camp was established. Petitioner was the directing head in these various expenditures and has testified that all the money charged to the so-called Rights account was spent in the various things done to try and get the gold mining enterprise started as a successful enterprise, except certain comparatively small sums in each year which he concededly spent for his own personal expenses, and which he claims he still owes to the trust. The state of the evidence in this case is confused and unsatisfactory. From all the evidence, however, we are not convinced that it was fraudulently conceived or operated or that petitioner failed to return income which he knew was taxable with the intent to evade the tax. The respondent contends that petitioner's testimony in all respects should be given little or no consideration in the determination of the issues involved in this proceeding. We cannot agree with this contention for the reason that petitioner's testimony on many points was corroborated by the testimony of Newcomb, one of the trustees throughout all of the years here involved. Newcomb and his family *122 had invested from $125,000 to $150,000 in the debentures and were the largest investors in the enterprise. We hold and have so found as a fact that no part of any deficiency for the years involved is due to fraud with the intent to evade tax. Since we have found that petitioner had a taxable net income for each of the years involved, and since petitioner filed no return for any year, the imposition of the delinquency penalty of 25 percent under the provisions of section 291 of the Revenue Acts of 1932, 1934 and 1936 is mandatory. Douglas L. Edmonds, Administrator, 31 B.T.A. 962. Decision will be entered under Rule 50. Footnotes
1. (b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3176 of the Revised Statutes, as amended.↩