Anthonius Boussen and Irma Boussen v. Commissioner.
Boussen v. Commissioner
Docket No. 21487.
United States Tax Court
1951 Tax Ct. Memo LEXIS 321; 10 T.C.M. (CCH) 158; T.C.M. (RIA) 51046; February 20, 1951
*321 Held, that petitioners understated their income in each of the years 1941-1944 with fraudulent intent to evade Federal income and victory taxes. Held, further, that the deficiencies determined by respondent for the years 1941 and 1942 are arbitrary and excessive. Donald G. Tripp, Esq., 1423 Ford Bldg., Detroit 26, Mich., for the petitioner. Norment Custis, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion Respondent determined the following tax deficiencies and fraud penalties against petitioners for the taxable years 1941-1944: 50%
Year
Deficiency
Penalty
1941
Income tax
$ 887.24
$443.62
1942
Income tax
1,925.78
962.89
1943
Income and vic-
tory tax
2,338.81
966.64
1944
Income tax
1,541.31
658.88
*322 This proceeding presents the following questions for our determination: 1. Did petitioners understate their income in each of the taxable years 1941-1944? 2. Were the income and victory tax deficiencies determined by respondent arbitrary and excessive in amount? 3. If petitioners understated their income in any of the taxable years, was this understatement made with fraudulent intent to evade tax? 4. Was the assessment of any deficiency barred under the statute of limitations set forth in section 275 (a), Internal Revenue Code? Findings of Fact Petitioners are husband and wife residing together in Detroit, Michigan. (Hereinafter the husband will be referred to as "petitioner.") Income tax returns for the taxable years 1941, 1942, 1943 and 1944 were filed with the collector of internal revenue for the district of Michigan. The return for the taxable year 1941 was filed in the name of petitioner only and he alone signed it. The returns for the years 1942 and 1943 were filed in the names of both petitioner and his wife and were signed by both of them. The return for the year 1944 was filed in the name of petitioner and his wife and was signed by petitioner *323 only. Petitioner was born in Holland, while his wife was born in Belgium. They were married in 1927 and in the same year came to the United States where they later obtained citizenship. They have one son born in 1930. From 1927 to 1938 petitioner was employed as a painter and decorator. In 1938 petitioner purchased a tavern in Detroit known as the White Pheasant and he and his wife continued to operate it throughout the ensuing taxable years. The premises on which the tavern was located were never acquired. The White Pheasant was patronized mainly by Belgian and Dutch factory workers who were employed nearby. Draught beer, bottled beer and whisky were served to patrons at all times and in 1942, 1943 and 1944 wine and miscellaneous foods were also sold to customers. The bar had a seating capacity of approximately 48 persons. In the years 1941 through 1944 petitioners received revenue from a juke box and pool table installed on the premises and they also operated a bowling alley at the tavern for a part of this period. On every Tuesday and Saturday night a Belgian archery game was played in the basement of the tavern, and this sport brought in additional receipts. In the mornings *324 a cleaning woman operated the bar, in the afternoons petitioner's wife took over, while at night petitioner was in charge of the tavern. Usually petitioner's wife assisted him on Saturday nights. At all times petitioner kept the financial records for the tavern business, which was the only source of income in the taxable years except for an insignificant amount of rent. These financial records consisted primarily of a daily diary for each calendar year. Gross receipts and cash expenditures for the White Pheasant were entered in the diary at the close of each business day. In 1941 petitioner used a cash register tape and entered daily gross receipts therefrom in his diary along with cash expenses, but no monthly or yearly summaries were entered. In 1942 petitioner no longer kept a cash register tape, but he continued to make daily entries of gross receipts and cash outlays in the 1942 diary, and monthly summaries were listed in the back of the book. In both 1943 and 1944 he made daily entries of gross receipts and cash expenses in his diary, but no monthly or annual totals were recorded. At the top center of the page for each day in all the diary books appeared a single set of figures *325 constituting receipts of the day from the tavern business. Periodically monthly receipts from bowling, the pool table, archery and the juke box appeared in the diaries. The daily cash expenses of the tavern were always set out individually and then totaled on the page of the diary set aside for the particular day. Expenses paid by check were not entered in the diaries. The diaries were not adequate records to give a clear, reliable picture of the tavern receipts and expenses in the taxable years. They contained erasures which petitioner could not adequately explain. Some figures were entered twice for the same expense. Figures were crossed out and scribbled over. In some instances there were figures in the diaries which petitioner could not explain, and in other instances petitioner declared that the diary entries were wrong. In one place petitioner could not determine whether a figure meant cash on hand or a telephone number. A page was torn out of the diary for 1942. His wife also made entries in the diaries, but usually she wrote them wrong and her husband had to correct them. Petitioner's returns reveal similar discrepancies. The ending inventory on the 1941 return is $75, *326 which does not agree with the beginning entry on the 1942 return $200of. The returns for 1943 and 1944 fail to show that any inventories were taken in those years. Petitioner never had an audit of his books and he never checked his diaries against his bank accounts. Those persons to whom petitioner went to have his tax returns filled out from 1941-1944 never saw his diaries, bank records or memoranda but only summaries of receipts and expenditures prepared by petitioner. Petitioner did not examine the returns prepared for him or check them against his diaries. In the years from 1941 through 1944 customers at the White Pheasant consumed the following quantities of draught and bottled beer: 1941
1942
1943
1944
Kegs of draught beer
818
1,041
869
886
Bottles of beer *
3,201
4,104
6,288
8,712
A keg of beer contains approximately 200 12-oz. glasses of beer. Only about 240 bottles of out-of-state beer were sold in the White Pheasant each year, a negligible amount compared to the quantity of local bottled beer sold. The price prevailing in petitioner's tavern for draught *327 beer in 1942 and 1942 was five cents for a 12-oz. glass. During 1943 the average price charged at the White Pheasant is subject to some uncertainty. Adolph Ferkett, whose neighboring tavern had approximately the same beer and whisky prices as the White Pheasant, charged 10 cents for a glass of draught beer throughout 1943, but the size of the glass varied in these months from 10 oz. to 12 and 14 oz. William Sova, another tavern keeper in the same neighborhood, charged 10 cents for draught beer in a 10-oz. glass during the whole of 1943. The average price charged for draught beer at the White Pheasant during 1943 and 1944 was not less than 10 cents for 12 oz. In 1944 the average price charged by petitioner remained 10 cents for a 12-oz. glass. In 1941 and 1942 the average price charged for bottled beer at the White Pheasant was 10 cents a bottle. There is no reliable record of the price in the next two taxable years. In 1943 and 1944 the prevailing price for local bottled beer at both the taverns of Ferkett and Sova was 15 cents, while these same taverns charged 20 cents for out-of-state beer during these two years. The average price for bottled beer at the White Pheasant in 1943 *328 and 1944 was not less than 15 cents. The quantities of whisky purchased by petitioner for his tavern and sold to customers in the years 1941 through 1944, and their cost to him were as follows: Average
Year
Quantity
Cost
cost
1941
1,526 quarts
$2,482.85
$1.57
1942
1,997 quarts
4,030.53
2.02
1943
1,747 fifths
4,178.87
2.39
1944
1,940 fifths
5,098.54
2.63
In this four-year period the White Pheasant purchased three grades of whisky for its customers, cheap or bar whisky, better grade whisky, and best grade whisky. In 1941 the cost of whisky to petitioner varied from approximately 85 cents per bottle for cheap whisky to $2 per bottle for the best grade. The average cost per bottle in that year was $1.57, or a price approximating that paid for the better grade whisky. The proportionate amounts of cheap, better grade, and best grade whiskies bought by petitioner did not vary appreciably from 1941 through 1944. The average price of whisky sold at the White Pheasant during all these years was equivalent to the price of better grade whisky. Whisky was sold at the White Pheasant in 1-oz. shot glasses at all times. There are approximately *329 32 1-oz. shots in a quart of whisky and 24 1-oz. shots in a fifth of whisky. In 1941 the prices prevailing at the White Pheasant for shots of bar whisky, better grade whisky, and the best grade whisky were 10 cents, 15 cents, and 25 cents, respectively. The average price for a shot of whisky in that year was 15 cents. Whisky prices at the White Pheasant in subsequent taxable years are uncertain. In 1942 bar whisky at Ferkett's tavern cost between 15 cents and 20 cents a shot, better grade whisky cost 25 cents a shot, and the best grade whisky cost 30 cents a shot. At Sova's tavern, bar whisky, better grade whisky, and best grade whisky cost 15, 20 and 25 cents a shot in 1942. During part of 1942 bar whisky was 10 cents a shot at the White Pheasant. The average price of whisky at the White Pheasant in 1942 was not less than 20 cents a shot. In 1943 and 1944 the three grades of whisky at Ferkett's tavern were priced at 25 cents, 35 cents and 40 cents a shot, while Sova charged 25, 30 and 35 cents. The average price of whisky at the White Pheasant in 1943 and 1944 was not less than 30 cents per 1-oz. shot. The gross receipts of the White Pheasant tavern in the years 1941, 1942, 1943 *330 and 1944 were $16,656.03, $24,120.77, $31,549.32 and $33,080.63, respectively. These amounts were computed as follows: 1941
Items
Quantity
Sales Unit *
Price
Sales
Draught beer
818 kegs
163,600 (12-oz. glass)
.05
$ 8,180.00
Bottled beer
3,201 (bottle)
.10
320.10
Liquor
1,526 qts.
48,832 (1-oz. shot)
.15
7,324.80
Total sales
$15,824.90
Amusement machine receipts
2,681.80
Total receipts
$18,506.80
Less 10% allowance for spillage, breakage, theft, etc.
1,850.67
Gross receipts
$16,656.03
1942
Draught beer
1,041 kegs
208,200 (12-oz. glass)
.05
$10,410.00
Bottled beer
4,104 (bottle)
.10
410.40
Liquor
1,997 qts.
63,904 (1-oz. shot)
.20
12,780.80
Wine
81.90
Food
694.60
Total sales
$24,377.70
Amusement machine receipts
2,423.15
Total receipts
$26,800.85
Less 10% allowance for breakage, spillage, theft, etc.
2,680.08
Gross receipts
$24,120.77
1943
Draught beer
869 kegs
173,800 (12-oz. glass)
.10
$17,380.00
Bottled beer
6,288 (bottle)
.15
943.20
Liquor
1,747 fifths
41,928 (1-oz. shot)
30
12,578.40
Wine
156.60
Food
1,142.55
Total sales
$32,200.75
Amusement machine receipts
2,854.05
Total receipts
$35,054.80
Less 10% allowance for breakage, spillage, theft, etc.
3,505.48
Gross receipts
$31,549.32
1944
Draught beer
886 kegs
177,200 (12-oz. glass)
.10
$17,720.00
Bottled beer
8,712 (bottle)
.15
1,306.80
Liquor
1,940 fifths
46,560 (1-oz. shot)
.30
13,968.00
Wine
25.75
Food
995.65
Total sales
$34,016.20
Amusement machine receipts
2,740.05
Total receipts
$36,756.25
Less 10% allowance for breakage, spillage, theft, etc.
3,675.62
Gross receipts
$33,080.63
*331 During the entire period from January 1, 1941 to December 31, 1944, it was the practice of petitioners to cash payroll checks for many of their customers. During the early months of 1941 petitioners were permitted to turn these checks over to the local breweries either in payment for beer or for cash. In the latter part of 1941, the practice of accepting checks from the tavern operators was discontinued by the breweries. It was then necessary for the petitioners to open a commercial bank account at the National Bank of Detroit, which they did on October 14, 1941. The bank account was used for two purposes, to deposit receipts from the tavern business and to deposit customers' checks that had been cashed with tavern receipts. Consequently, while the balance in the checking account at all times constituted receipts from the business, yet the total annual deposits in this account bore no relationship to the business gross receipts in the years 1941 through 1944. No adequate explanation was offered for some of the deposits to this checking account *332 or for some of the checks drawn thereon. Petitioners had previously opened a savings account in the National Bank of Detroit on September 18, 1935, which they retained through 1944. On December 6, 1944, petitioners also rented a safe deposit box in this bank, whose contents were never satisfactorily explained. Petitioner's tavern was the main source of income from 1938 through 1940. In these years his income was not more than $2,500 per year. He did not file any tax return in 1938. Returns filed in 1939 and 1940 showed insufficient income for tax liability. On January 1, 1941, petitioners had the following assets and the following liabilities, resulting in a net worth of not less than $7,436.76: ASSETS
Cash on hand, in cigar box at tavern
to cash checks
$ 178.00
Cash in bank - savings account
603.76
Dwelling house and lot
1,925.00
Life insurance policy (death value)
1,000.00
Business assets -
White Pheasant tavern
2,200.00
Additional furniture and fixtures
800.00
Inventory (January 1, 1941)
75.00
Automobile
905.00
Boat
50.00
Total
$7,736.76
LIABILITIES
Payments due on mortgaged dwelling
$ 300.00
Net worth (January 1, 1941)
$7,436.76
*333 On December 31, 1944, petitioners had a net worth of not less than $25,209.07 based on the following assets and liabilities: ASSETS
Cash in cigar box at tavern to cash
checks
$ 675.91
Cash in bank
Savings account
110.05
Checking account
11,741.86
U.S. Government bonds (face value
$6,375)
4,781.25
Dwelling house
1,925.00
Improvements to house
500.00
Life insurance policy (death value)
1,000.00
Business assets
White Pheasant tavern
2,200.00
Additional furniture and fixtures
720.00
Inventory (December 31, 1944)
Automobile
905.00
Lot
400.00
Boat
250.00
Total assets
$25,209.07
LIABILITIES
None
Net worth (December 31, 1944)
$25,209.07 Petitioner and his wife received no assets by way of gift, inheritance, or other similar source during the period from January 1, 1941 through December 31, 1944. The living expenses of petitioner's family for 1941, 1942, 1943 and 1944 were approximately $1,400.96, $1,438.10, $1,651.60 and $1,500, respectively. In 1946 and 1947 petitioner dealt extensively in the black market in Holland, sending over such items as cigarettes and soap in large quantities. The tax returns filed by petitioner or by *334 petitioner and his wife for the years 1941-1944 reveal the following gross receipts from the tavern business and the following net income: Gross receipts
from White
Year
Pheasant
Net income
1941
$14,529.65
$2,740.80
1942
18,867.00
2,656.00
1943
20,626.25
3,560.01
1944
26,040.30
4,040.97 The gross receipts from the tavern reported on each return were substantially the same as the total of the tavern receipts recorded in the daily dairy for that year. Respondent issued a notice of deficiency determining deficiencies in petitioners' income and victory taxes for the period 1941-1944. In each year a 50 per cent penalty was added to the deficiency under section 293 (b) of the Code. The notice stated in part: "Principal cause of the deficiency in tax and penalties recommended was the taxpayers' failure to report total business receipts. "The books and records maintained did not adequately reflect items of business income and expense." In schedules attached to the notice of deficiency respondent recomputed gross receipts from the tavern business by use of the mark-up method. Such gross receipts were computed to be $20,259.10 in 1941, $26,372.60 *335 in 1942, $27,104.95 in 1943, and $30,806.85 in 1944. Gross receipts from the tavern business reported on the tax returns for each of the taxable years 1941 through 1944 were intentionally understated with the intent to defraud the United States of income and victory taxes due. A part of the deficiency for each of the years 1941 through 1944 was due to fraud with intent to evade tax. The deficiencies determined by respondent in 1941 and 1942 were arbitrary and excessive in amount. Opinion HILL, Judge: The first question for our consideration is whether petitioner and his wife understated their income in the taxable years 1941 through 1944 due to a failure to correctly report gross receipts from their tavern business in these years. Respondent allowed all deductions claimed by petitioner and his wife on their returns for these years so that they are not in issue. Petitioners contend that the gross receipts from the tavern business were correctly reflected on their returns for these years. Moreover, they assert that the deficiencies determined by respondent based upon a reconstruction of tavern receipts by the mark-up method should be set aside as arbitrary and excessive under *336 the principles of Helvering v. Taylor, 293 U.S. 507. Petitioners rely principally on two grounds to support their views. First they assert the daily diaries clearly reflected their income from the White Pheasant so that respondent was bound by these records in determining the amount of gross receipts from the tavern business. They note that the gross receipts from the tavern business reported on each return are substantially in accord with the total receipts entered in the daily diary kept by petitioner for that year. Secondly, petitioner and his wife argue that the mark-up computation of receipts from the tavern business made by respondent should be disregarded as inaccurate, incomplete and unsupported by the evidence. We are convinced that petitioner's diaries are totally inadequate to clearly reflect petitioner's income from the tavern business. In the first place these diaries represent the crudest sort of homemade system of accounting from which it is impossible to discern with any assurance of exactitude the amount of tavern receipts. The various discrepancies and shortcomings of these diaries noted in our findings persuade us that no reliance can be placed upon *337 the accuracy of the figures entered therein Furthermore, there is another cogent reason for questioning the adequacy of these diaries as records of tavern receipts during the taxable year. All the income realized from the White Pheasant obviously was not entered therein. We base this conclusion upon the following reasons. Almost the entire net income of petitioner in the taxable years was derived from the White Pheasant. The gross income from the tavern reported on each of petitioner's returns was in substantial accord with the receipts recorded in the diary for that year. Yet a comparison of the total net income reported by petitioners for the years 1941-1944 in the amount of $12,997.78 with the total of petitioners' increase in net worth over these years of $17,772.31 plus living expenses amounting to $5,990.66 plainly shows that a large amount of net income was not reported. Such increase in net worth and living expenses constituted net income because petitioner admitted that no gifts, bequests or other similar transfers of property were made to him or his wife during these years. It is true that petitioners attempt to partially explain the increase in net worth by the contention *338 that on January 1, 1941, they had hidden away in an iron box at home between $5,000 and $6,000 cash which they had saved from income earned in 1938, 1939 and 1940. They state that this entire sum was gradually deposited in their checking account during the period prior to 1945. We note both that petitioners' income in the years of supposed saving never exceeded $2,500 and the existence of a savings account at the time such funds were allegedly hidden at home. We further note the divergent and conflicting testimony of petitioner and his wife concerning the alleged cash. Under the circumstances we are not persuaded the supposed savings were more than a figment of the imagination. Thus it is only reasonable to conclude that the above noted additional unreported income constituted tavern receipts which petitioner failed to enter in the diaries. Therefore we hold that due to the inadequacy of petitioner's diaries to correctly reflect income, respondent was not bound by them but was entitled under section 41 of the Code to recompute petitioners' income from the tavern business by means of the mark-up method. Louis Halle, 7 T.C. 245, affirmed 175 Fed. (2d) 500, *339 certiorari denied 338 U.S. 949, and Harris et al. v. Commissioner, 174 Fed. (2d) 70. Petitioners also contend the gross receipts of the White Pheasant computed by respondent in his notice of deficiency for each of the taxable years should be disregarded as inaccurate and unsupported by the evidence. Specifically they challenge the quantities, sales units and average prices employed by respondent in recomputing receipts from sales of draught beer, bottled beer and liquor in these years. Respondent impliedly admits the quantities, sales units and prices of these items appearing in the schedules attached to the notice of deficiency are unsupported by the evidence in many instances by submitting on brief a revised computation of beer and liquor receipts from the White Pheasant for the taxable years. The quantities and sales units of beer and liquor appearing in respondent's revised computation are fully supported by the evidence and we have adopted them in our findings of fact. With regard to the average prices charged for each of these items in the taxable years, we have been guided in our findings by the prices prevailing in neighboring taverns in those *340 instances where petitioner and respondent are in disagreement. The prices quoted by petitioner and his wife and by White Pheasant patrons appearing on their behalf are too contradictory, incomplete and at variance with prevailing prices to be relied upon. The beer and whisky prices quoted by the internal revenue agent in several instances are completely at odds with all the evidence. Under these circumstances the prices charged by taverns in the neighborhood afford the most reliable standard. In our computation of gross receipts from the White Pheasant we have adopted the wine, food and amusement machine receipts as well as the 10 per cent allowance for breakage, spillage and theft, appearing in respondent's schedules attached to the notice of deficiency. Petitioners have not come forward with any evidence to upset the presumptive correctness of respondent's determination in regard to these items. We found as a fact that petitioners received gross receipts of $16,656.03, $24,120.77, $31,549.32 and $33,080.63 in the respective years 1941, 1942, 1943 and 1944. These figures are in excess of those reported by petitioner in each of the taxable years, but are less than the gross receipts *341 computed by respondent in his notice of deficiency for 1941 and 1942. We therefore hold that petitioners understated their income in each of the taxable years. We further hold that the gross receipts computed by respondent for 1941 and 1942 are unsupported by the evidence and the deficiencies resulting therefrom are arbitrary and excessive in amount. Petitioners' tax liability in each of these two years must be recomputed under Rule 50. Having determined that petitioners understated their income in each of the taxable years, we now turn to the question whether such understatement was due to a fraudulent intent on the part of petitioners to evade taxes. The burden of proof is upon respondent to establish fraudulent intent with clear and convincing proof. M. Rea Gano, 19 B.T.A. 518. Mere negligence is not sufficient. Mitchell v. Commissioner, 118 Fed. (2d) 308. To establish fraud by direct proof of intent is rarely possible. This Court has held that a failure to report income undoubtedly received, such failure being due to an untenable excuse, evidences a fraudulent attitude of mind. M. Rea Gano, supra, and Charles E. Mitchell, 32 B.T.A. 1093. *342 After careful consideration of the entire record and petitioners' conduct on the stand, we are convinced that petitioners fraudulently made false returns for each of the taxable years. The vague, evasive and contradictory testimony of petitioners, their failure to adequately explain many entries in the diaries, bank deposits and checks, their elaborate artifice in asserting they had cash savings in an iron box at home, all prevent reliance on the truth of their statements. Petitioner's dealings in the black market overseas in years following the taxable period under consideration further undermine our belief in his innocence of improper motive. The understatements of income are too large, too continuous and persistent to be attributable to mere inadvertence or negligence. Petitioners knew their duty to report all their income and had the requisite intelligence to do so. Under these circumstances their failure to report gross income aggregating $25,343.55 over the space of four years shows a clear design on their part to evade their tax responsibilities. We therefore uphold respondent's imposition of the fraud penalty in each of the taxable years. Our holding on the above issue *343 makes it unnecessary for us to consider the issue whether the assessment of deficiencies against petitioners was barred by the statute of limitations. Decision will be entered under Rule 50. Footnotes
*. The totals for bottled beer include both out-of-state and local beer.↩
*. Sales units were computed on the basis of 200 - 12-oz. glasses of beer per keg 32 - 1-oz. shots to a quart 24 - 1-oz. shots to a fifth↩