Reuben D. Silliman v. Commissioner.
Silliman v. Commissioner
Docket No. 31101.
United States Tax Court
1952 Tax Ct. Memo LEXIS 93; 11 T.C.M. (CCH) 921; T.C.M. (RIA) 52271; September 5, 1952
*93 Statute of limitations: Fraud penalties. - After World War I the petitioner, a lawyer, recovered for his clients properties that had been vested in the Alien Property Custodian. His clients paid him sums in excess of the amounts then allowed by statute to agents and attorneys for such services. Such excess amounts were not included in the petitioner's returns. Held, that the returns filed were false and fraudulent with intent to evade tax and assessment is not barred. Held, further, that the deficiencies are due to fraud with intent to evade tax and the fraud penalty is properly imposed. *94 Sherwood E. Silliman, Esq., 70 Pine St., New York, N. Y., and Joseph J. O'Connell, Jr., Esq., for the petitioner. John J. Madden, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax and fraud penalties for the years and in the amounts as follows: Year
Deficiency
50% Penalty
1924
$175,393.62
$87,696.81
1926
52,722.86
26,361.43
1927
4,014.40
2,007.20
The basis for the deficiencies is unreported fees for professional services. The fraud penalties are asserted under the provisions of section 275 (b) of the Revenue Acts of 1924 and 1926. The petitioner alleges several errors as to each year. In essence, they are: That the statute of limitations bars assessment and collection; that there was error in determining the amount of the petitioner's income; and that the returns were not false or fraudulent with intent to evade tax. Findings of Fact The petitioner is an individual who resides in East Orange, New Jersey. He filed income tax returns for the years 1924, 1926 and 1927 with the collector of internal revenue for the second district of New York. He was engaged *95 in the practice of law from 1894 until his retirement in 1947. He started his practice in Duluth, Minnesota. He went to Honolulu, Hawaii, in 1898 where he practiced law for two years. He was then appointed to the Hawaiian Tax Appeal Court which had jurisdiction over all tax matters in the Hawaiian Islands. He was appointed and served as a Judge of the Republic of Hawaii, and upon creation of the Territory of Hawaii he was a Judge of a Court of the Territory. He practiced law in California from 1903 to 1905 and thereafter in New York City until his retirement. At the outbreak of World War I, the properties of John F. Hackfeld, Beta Isenberg, Francis Pfotenhauser, Annie Pfotenhauser and Hans Pfotenhauser were vested in the Alien Property Custodian. Upon conclusion of the war, the petitioner was retained by these individuals to secure a return of their property. The petitioner's agreement with John F. Hackfeld was oral. Both the petitioner and Hackfeld were aware of the provisions of the Winslow Act * which was then in effect and which permitted the payment to attorneys or agents of three per cent of any money or the value of any property recovered under the Trading with the Enemy *96 Act. The petitioner was unwilling to accept a three per cent fee as compensation for the effort that would be required in order to recover Hackfeld's property. The arrangement agreed upon was that the petitioner was to receive a total of 13 per cent of any recoveries on behalf of Hackfeld, which percentage was made up of the three per cent allowed by statute and an additional 10 per cent to be paid by Hackfeld. The agreement was entered into before the services were performed by the petitioner for Hackfeld. In October, 1924, the petitioner entered into an agreement with Beta Isenberg to represent her in the prosecution of her claim for the recovery of her money and property from the Alien Property Custodian and//or the Treasurer of the United States. The agreement was reduced to writing and signed by the petitioner and by Beta Isenberg's attorney-in-fact, Alex W. Sielcken. It provided that Beta Isenberg was to pay to the petitioner "for his services, including all associated lawyers and assistants, ten percent of all money and/or property received by or for Claimant [Beta Isenberg] from the Alien Property Custodian, the Treasurer of the *97 United States or any other agency of the Government of the United States." The agreement was prepared by the petitioner. During the years 1924, 1926 and 1927, the petitioner was on the cash receipts and disbursements method of accounting. In June, 1924, there was returned to John F. Hackfeld by the Alien Property Custodian, under Claim No. 13859, Trust No. 12640, the petitioner being the attorney of record, the following property: June 7, 1924 by check
$ 976,727.35
June 7, 1924 Liberty Bonds
2,410,950.00
June 25, 1924 by check
25,711.70
Total
$3,413,389.05
In June, 1924, John F. Hackfeld paid to the petitioner, by check, sums aggregating $134,801.02 for services rendered. Hackfeld also turned over to the petitioner for services rendered 13 per cent of the Liberty Bonds that he received from the Alien Property Custodian. In the year 1924, the petitioner paid to other lawyers and to another representative of Hackfeld sums aggregating at least $74,000. In his income tax return for the calendar year 1924 the petitioner reported as income from business or profession the sum of $34,739.41. From this he deducted as salaries, rent, repairs, and other expenses *98 an aggregate of $10,945.92. The net income from his profession was reported as being in the amount of $23,793.49. In May, 1926, Frederick Rodiek, attorney-in-fact for John F. Hackfeld, paid to the petitioner, by check, the sum of $14,583.47. In the year 1926, there was returned to Alex W. Sielcken, as attorney-in-fact for Beta Isenberg, by the Alien Property Custodian, under Claim No. 12020, Trust No. 12611, the petitioner being the attorney of record, the following property: April 13, 1926 Securities
$1,458,102.50
April 14, 1926 Check
618,509.14
April 20, 1926 Check
46,199.61
Nov. 30, 1926 Check
399,826.02
Total
$2,522,637.27
In the year 1926 the petitioner received from or on behalf of Beta Isenberg, for services rendered, the following amounts: April 16, 1926
$209,207.65
April 23, 1926
4,619.96
Dec. 9, 1926
39,982.60
Total
$253,810.21
In his return for the calendar year 1926, the petitioner reported as "income from business or profession" the sum of $53,825.81. From that he deducted as salaries, rent, repairs, and other expenses the sum of $16,502.32. He reported as net profit from his profession the sum of $37,323.49. *99 During the year 1927, there was returned to the petitioner's clients, by the Alien Property Custodian, the following amounts and values in securities: Client
Date
Amount
John F. Hackfeld
April 26, 1927 Check
$206,233.70
July 11, 1927 Check
4,250.78
Total
$210,484.48
Beta Isenberg
Jan. 18, 1927 Check
$190,933.04
Feb. 21, 1927 Check
33,724.78
April 8, 1927 Check
1,991.82
April 29, 1927 Check
23,387.81
May 10, 1927 Check
34,806.29
July 6, 1927 Check
2,717.82
Nov. 22, 1927 Check
317.67
April 4, 1927 Securities
5,400.00
May 27, 1927 Securities
253.94
Total
$293,533.17
Hans Pfotenhauser
Feb. 1, 1927 Check
$ 2,851.35
Francis Pfotenhauser
Jan. 18, 1927 Check
2,813.33
Annie Pfotenhauser
Sept. 20, 1927 Check
1,430.19
Some of the above 1927 payments were made directly to the claimants and some to attorneys-in-fact, including the petitioner. By the issuance of, and exchange of, checks in the year 1927 the petitioner received for his services from the clients listed in the preceding paragraph the sum of $49,532.74. In the petitioner's income tax return for the year 1927 he reported as income from his business or *100 profession the sum of $33,313.25. From that sum he deducted as salaries, depreciation, rent, repairs, and other expenses the amount of $17,542.70, and reported a net income from his profession in the amount of $15,770.55. John F. Hackfeld died in 1932. Beta Isenberg died in 1933. The petitioner filed an income tax return in 1914 pursuant to the provisions of the Revenue Act of 1913, and has filed returns continuously since that time. It was the practice of the petitioner to keep records of his financial transactions in two envelopes for each calendar year. One envelope contained income tax data and the other contained his bank statements and brokers' statements. Those records showed all funds that the petitioner received in each year. There is no evidence as to whether or not the petitioner's records showed any part of the funds to have been received as gifts, nor as to whether or not they reflected the receipt of the Liberty Bonds that were turned over to him by his client, Hackfeld. The petitioner's income tax returns for the years 1924, 1926 and 1927 were audited by the Bureau of Internal Revenue. In making the audits, the representatives of the Bureau examined the petitioner's *101 records. No deficiencies were determined at the time of the audits. The petitioner periodically cleaned out his files, and the original records for the years 1924, 1926 and 1927 are not now in existence. The petitioner in his return understated his income from his profession for the years 1924, 1926 and 1927 by the amounts, respectively, of $345,822.85, $191,168.07 and $16,900.82. The returns filed by the petitioner were false and fraudulent with intent to evade tax. The deficiencies are due to fraud with intent to evade tax. Opinion ARUNDELL, Judge: The deficiencies determined by the respondent are assessable only if the returns filed by the petitioner were false or fraudulent with intent to evade tax. Section 278 (a), Revenue Acts of 1924 and 1926. The fraud penalties can be sustained only if part of the deficiencies are due to fraud with intent to evade tax. Section 275 (b), Revenue Acts of 1924 and 1926. The income of the petitioner which is the basis of the deficiencies consisted of professional fees received from persons whose property had been seized by the Alien Property Custodian in World War I. The petitioner, a practicing attorney, obtained the restoration of those *102 properties, or their proceeds, to their former owners. Under agreements with the several owners, he received fees for the professional services that he rendered. The total amount that he received from each client, according to the petitioner's testimony, consisted of two parts. One part was what he describes as a basic fee or legal fee which was three per cent of the recovery. The additional part, he says, was to be paid if it could be paid legally, otherwise the clients were to make gifts to him of the additional part. In the Hackfeld matter, the additional part was to be 10 per cent of the recovery. In the Isenberg matter, the additional part was to be seven per cent, but when the agreement was reduced to writing by the petitioner there was no break-down into parts, but the total of 10 per cent was specified as payment for his services. The precise terms of the agreements with other clients are not in evidence. The petitioner's case is grounded on two main points: First, that he properly treated as non-taxable the amounts that he received in excess of the three per cent limitation allowed by the Winslow Act. Second, that the respondent has failed to prove that the returns filed *103 were false or fraudulent with intent to evade tax. The evidence establishes that the amounts received by the petitioner from his clients in connection with the recovery of property that had been seized by the Alien Property Custodian constituted income for professional services rendered which should have been included in gross income in the full amounts received. The evidence also establishes that the petitioner's returns were false and fraudulent with intent to evade tax and that the deficiencies are due to fraud with intent to evade tax. When the petitioner made his fee arrangements with the several clients for whom he obtained recoveries from the Alien Property Custodian, he was aware of the fact that the Alien Property Custodian law allowed a maximum fee of three per cent of amounts recovered. His principal clients were John F. Hackfeld and Beta Isenberg. The agreement with Hackfeld was oral. The petitioner's testimony as to the agreement with Hackfeld is that he was not willing to put forth the effort that was required for his claim against the Alien Property Custodian on a three per cent basis unless the law so limited him and there was no way to avoid it. However, if it *104 was legally proper for Hackfeld to pay him more than the three per cent statutory fee, it was to be paid as a gift. This testimony is obviously selfcontradictory in its several parts. The petitioner was willing to use his professional training and abilities to recover Hackfeld's properties, but not for a fee of three per cent of the amount recovered. He wanted more, and Hackfeld was willing to and did pay him more. The payments above three per cent of the recoveries were for services rendered and not a gift, as contended for by the petitioner. The agreement with Beta Isenberg provides that Mrs. Isenberg was to pay to the petitioner "for his services, including all associated lawyers and assistants, ten percent of all money and/or property" recovered. This agreement on its face establishes the entire 10 per cent to be a fee for professional services. Even if we regard the petitioner's testimony as establishing that the intent of the parties was that he was to receive from Mrs. Isenberg a basic fee of three per cent plus an additional seven per cent, we still are not persuaded that the additional amount was a gift. It is clear from the petitioner's testimony that he did not regard *105 three per cent of the recoveries as adequate and full compensation for the services that he would be required to perform in the prosecution of his clients' claims. The claimed separation of the amounts received by the petitioner into a so-called basic fee of three per cent and an additional amount to be paid when the property was returned to his clients appears to have been purely a mental operation. The stipulated facts show in considerable detail the dates and amounts of the recoveries effected by the petitioner and the dates and amounts of payments made to or retained by the petitioner for his services. A few examples taken from the stipulation demonstrate the coincidence in time of recoveries and the payment of the petitioner's fees. On June 25, 1924, there was returned to Hackfeld the sum of $25,711.70 by check of the Treasurer of the United States which was deposited in Hackfeld's bank account the following day. On June 28, 1924, there was deposited in the petitioner's regular bank account the sum of $3,342.52, which was 13 per cent of the amount received by Hackfeld three days earlier, and on June 30, 1924, the amount of $3,342.52 was debited to Hackfeld's bank account. On *106 November 30, 1926, the Alien Property Custodian paid to Beta Isenberg's attorney-in-fact, by check, the amount of $399,826.02. Ten per cent thereof, that is, $39,982.60 was credited to the petitioner's bank account on December 9, 1926. On April 26, 1927, a United States Treasurer's check in the amount of $206,233.70 was issued, drawn to the order of the petitioner as attorney-in-fact for John H. Hackfeld in payment of his claim against the Alien Property Custodian. The check was deposited in a special bank account of the petitioner. On May 4, 1927, there was debited to that account the sum of $185,610.33, and on the same date the same amount was credited to Hackfeld's bank account. The difference between these amounts is $20,623.37 which is 10 per cent of the amount of the recovery which was retained by the petitioner. In all instances in which the stipulation shows dates and amounts, the petitioner received his fee simultaneously with, or a few days after, issuance of Government checks in payment of his clients' claims. It is significant that none of the amounts paid to, or retained by, the petitioner out of the sums recovered for his clients was limited to three per cent of the recovery. *107 It establishes that neither the petitioner nor his clients carved out of the payments to the petitioner any amount representing three per cent. The stipulated facts as to dates and amounts of payments to the petitioner afford no support to the petitioner's contention that amounts received by him in excess of three per cent were in any different category than the amount equivalent to three per cent of the recoveries. They support the respondent's determination that the full amounts received by the petitioner were fees for professional services rendered. Under the facts in this case, it is obvious that the fees received by the petitioner in excess of three per cent of the recoveries were not gifts. They were fees charged by the petitioner for the rendition of professional services and paid by his clients for such services. A gift, as has often been said, imports that there is no consideration. Thus, in the case of Alexander B. Siegel, 39 B.T.A. 60, the taxpayer, a lawyer, and his client had agreed upon a fee in full for his services. The client in that case profited from the transaction in which the lawyer's services had been fully performed. After agreement on the fee *108 in that case, the client voluntarily gave the lawyer an option on a number of shares of stock which eventually proved to be of considerable value to the lawyer. We stated in our opinion in that case that "The offer was wholly unexpected * * *." In this case, in contrast to the Siegel case, the fees were expected and received by the petitioner for services rendered. The case of Bogardus v. Commissioner, 302 U.S. 34, is readily distinguishable from this one. In the Bogardus case, the stockholders of a newly organized corporation, through their corporation, made gifts to former employees of a corporation whose stock had been acquired by new interests at a profit to the former stockholders. None of the recipients was employed by the new corporation or by its stockholders. In that case, it was stipulated that the payments were not made or intended to be made by the new corporation or any of its stockholders for services rendered or to be rendered, or for any consideration given or to be given by the recipients to the new corporation or its stockholders. It appears from the Court's opinion in that case that the payments were prompted by reason of the "great good fortune" that *109 had inured to the stockholders as the result of their participation in the old company, and that the payments were an act of "spontaneous generosity." Upon review of the facts in the Bogardus case, the Court concluded that there was a "clear intention to make gifts" and that "intention must govern * * *." (p. 1200) In contrast to the Siegel and the Bogardus cases, we have here an entirely different background for the payments and we cannot find any intention to make gifts. In the cited cases, full compensation of the donees had been paid or agreed upon, while in this case it is clear that the petitioner did not regard the three per cent payments allowed under the Winslow Act as full and adequate compensation. As the amounts received by the petitioner in excess of the statutory three per cent were fees for services rendered, they were income under the taxing statute, and the fact that their receipt might have subjected him to penalties does not exempt them from taxation nor afford a legitimate reason for failing to report them. United States v. Sullivan, 274 U.S. 259. The petitioner omitted from his returns substantial portions of the fees paid to him for professional *110 services rendered. He did not even return as gross income the full amount of the three per cent allowed to him under the Winslow Act. His testimony is that he deducted from the three per cent the amounts that he was required to pay to attorneys and others associated with him in effecting the recoveries. The forms filed by the petitioner provided for the reporting of "Total Income" and for deductions therefrom to arrive at net income. The consequences of this and of his failure to report any part of his fees in excess of three per cent of the recoveries for his clients is the omission from his returns of very substantial amounts of income. Such omissions, considered in connection with other evidence in the case, compel the conclusions that the petitioner's returns were false and fraudulent with intent to evade tax and that the deficiencies are due to fraud with intent to evade tax. It has often been held that under our revenue system every taxpayer is, in the first instance, his own tax assessor. The privilege of determining his own tax carries with it the responsibility to deal frankly and honestly with the Government and to make a full disclosure and return of all income received. *111 Such responsibility is not discharged by resolving all doubts against the Government. Charles E. Mitchell, 32 B.T.A. 1093, in which case the imposition of the civil fraud penalty was sustained in Helvering v. Mitchell, 303 U.S. 391. We have also held that failure to report sums unquestionably received, the omission being predicated on a patently lame and untenable excuse, evidences a fraudulent purpose. M. Rea Gano, 19 B.T.A. 518, 533. Among the elements that establish the existence of fraud in this case are the facts that the petitioner, in the practice of his profession, was accustomed to receiving as income fees for his professional services; for a number of years prior to the taxable years he had filed income tax returns and must have been familiar with the requirement of reporting income derived from whatever source; in the taxable years the petitioner received substantial sums in excess of the three per cent provided for by the Winslow Act, which sums were for services rendered and which he knew were not gifts; and that he not only failed to report such excess sums as income but failed to make any disclosure thereof in his returns. *112 The evidence offered by the petitioner in our opinion does not serve to overcome the proof of fraudulent intent. He testified that before filing his returns he consulted various Government officials, including a representative of the Bureau of Internal Revenue, who advised him to report only the three per cent that was allowable under the Winslow Act. He further testified that his returns were examined by representatives of the Bureau of Internal Revenue, and that at the examinations for the years 1924 and 1926 he turned over his records to the examining agent and was present at the examinations. As to the year 1927, the petitioner's son testified that he, in the petitioner's absence from the country, gave the records to the examining agent and had some discussion with him as to some items on the return. The agents accepted the returns filed as being correct. We cannot accept without corroboration the statement that the petitioner was advised by Government officials, particularly by any Internal Revenue Bureau representative, to treat as gifts any part of the sums received by him from his clients if the facts, as developed before us, had been disclosed to the Government representatives. *113 The statutes in effect in the taxable years made a clear distinction between items to be included in gross income, among which was "compensation for personal service * * * of whatever kind and in whatever form received," and items not to be included therein and exempt from tax, among which was the "value of property acquired by gift * * *." Section 213, subsections (a) and (b) (3) of the Revenue Acts of 1924 and 1926. In Bogardus v. Commissioner, supra, the Court referred to similar provisions of the Revenue Act of 1928 and said that they were "very plain and direct." Both terms had been judicially defined, and in view of the clear distinction between them in the taxing acts, we cannot believe that any representative of the Bureau of Internal Revenue would have given to the petitioner the advice that he says he received if there had been a full disclosure of facts. As to the records examined by agents upon audit of the petitioner's returns, the only evidence is the petitioner's testimony that the records included all of the receipts of funds in the taxable years. There is no evidence as to whether or not the funds shown to be received were segregated as between what the *114 petitioner now contends were gifts and the sums reported as income. Also, there is no showing that the records contained anything to show the receipt of Liberty Bonds which the petitioner now admits that he received from his client Hackfeld. That item alone, at the rate of 10 per cent of the amount of the bonds, was $241,095. We do not know what explanation was given to the examining agents as to the monies and property received in excess of the amounts reported on the returns. It is difficult to believe that agents of the Bureau would approve the omission from returns of the substantial amounts that were omitted by the petitioner if the complete facts had been disclosed to them. The petitioner places emphasis on the span of years that has elapsed between the occurrence of the events upon which the deficiencies are based and the respondent's determination. We are not unmindful of this fact. It is regrettable that it should occur, but the open statute in case of fraud is the enactment of Congress and it is beyond our power to change it. We have set out in the findings of fact the amounts by which the petitioner understated his professional income. These are the amounts that the *115 respondent requests be found to be omissions. They are amply sustained by the evidence of the amounts received by the petitioner compared with the amounts reported by him. In two of the years, these amounts are less than the amounts upon which the determination of deficiencies is based and which are presumptively correct. Old Mission Portland Cement Co. v. Helvering, 293 U.S. 289. Decision will be entered under Rule 50. Footnotes
*. 50 U.S.C., Appendix, section 20↩.